WILLIAM H. McSOLEY, JR. *et al. vs.* ALICE M. McSOLEY *et al.*

MAY 25, 1960.

PRESENT: Condon, C. J., Roberts, Paolino, Powers and Frost, JJ.

64

PAOLINO, J. This is an appeal from a decree of the probate court of the town of Warren denying a petition to admit to probate two written instruments purporting to be the last will and testament of William H. McSoley, who died on September 27, 1948. The instruments comprise a will dated July 9, 1947 and a codicil thereto dated June 30, 1948. After a trial in the superior court, the jury returned a general verdict for the proponents and made special findings sustaining both instruments.

The case is before us on the contestants' exceptions to certain evidentiary rulings and to the denial of their motion for a new trial. It is also here on proponents' single exception to a ruling of a justice of the superior court denying their motion to strike from the record the entry of appear-

ance of Alice M. McSoley in her capacity as administratrix. The proponents also filed a motion in this court to strike her appearance and to dismiss the bill of exceptions as to her in such capacity.

William H. McSoley, the decedent, was admitted to the practice of law in this state in 1903. He was first married in 1906 but in 1912 his wife died. Two children were born of that marriage, Catherine E. McSoley, now Catherine E. Beagan, and William H. McSoley, Jr. Thereafter in 1914 decedent married Alice M. Sullivan, who bore him six children, five of whom survived him. At the time of the second marriage, Catherine E. and William H., Jr. were aged six years and four years respectively, and lived with the father and his second wife for about three years. Thereafter decedent placed the two children with their paternal aunts and they never returned to live at his home.

The decedent became a prominent and successful lawyer and maintained an office in Providence and an evening office in his home in Warren. About twenty years before his death he purchased a home at 21 Miller street in that town, where he resided with his wife and the children of the second marriage. It is admitted that he was a good provider for his wife and children. They all shared in his love and benefited from the results of his worldly success.

It appears from the evidence that decedent gave all his children generous educational opportunities. Catherine attended private schools and graduated from college. William H., Jr., hereinafter called William, graduated from college and law school, and after his admission to the bar became associated with his father until the latter's death with the exception of the period of his service in the navy during World War II. The decedent took great interest in the affairs of all his children. Their accomplishments afforded him great pleasure and pride and the failure of some of them to attain what he had hoped for caused him disappointment. It is undisputed that he visited the children

of his first marriage very often, especially on Sundays and holidays, and that he was otherwise completely devoted to their welfare until his death.

The decedent enjoyed good health up to 1945. In that year he began to suffer from sudden and severe abdominal pain. He sought medical care and in February 1945 after a sudden attack of pelvic pain he entered St. Joseph's Hospital in Providence. The diagnosis indicated symptoms of acute urinary disorder. He had attacks of pain in January and February and again in April. In May of the same year, because of another attack of pain, he entered the Homeopathic Hospital in Providence. The diagnoses among others at this time were arteriosclerosis, myocarditis, chronic duodenal ulcer and diverticulum descending colon.

His condition did not improve and on September 10, 1945 he went to the Lahey Clinic in Boston for examination and advice. As a result thereof he entered the New England Baptist Hospital on October 17, 1945 where surgery was performed by a Dr. Cattell of the Lahey Clinic resulting in a gall bladder operation and the removal of several stones and diverticulae. During his convalescence he had fever, disorientation and mental confusion. He was discharged from the hospital on November 7, 1945 at which time his mental confusion still persisted. However, he reported to the Lahey Clinic on December 21, 1945 for a postoperative checkup and Dr. Cattell noted on the clinic's records that decedent was very well, wished to return to work and was mentally clear. On his return from the hospital in November 1945 he was attended by his family physician Dr. Ralph J. Petrucci of Warren, to whose testimony we shall hereinafter refer.

In August 1947 he went to the Lahey Clinic for another examination. He complained that for two years he had experienced lapses of memory, spells of mental confusion, the sensation of falling forward, a stumbling gait at times, urinary frequency and nocturia. He visited the Lahey

Clinic again on September 2 and October 30, 1947. On December 3, 1947, after another examination at the clinic, the doctors concluded he had Paget's disease and marked arteriosclerosis as well as a condition which required an operation.

On January 4, 1948 he entered the New England Baptist Hospital. The doctors concluded that his lapses of memory, occasional stumbling gait and spells of mental confusion were due to cerebral arteriosclerosis. An operation was performed by Dr. Earl E. Ewert and his convalescence was characterized by mental confusion and disorientation. The hospital record shows that there were times when he was cooperative, but that upon his discharge on January 20, 1948 he was still mentally confused. However, after a checkup on March 2, 1948 Dr. Ewert noted that decedent was mentally clear.

On January 22, 1948 he returned to his office and worked there daily until September 9, 1948 when he left it for the last time. On September 13 he entered St. Joseph's Hospital where he died on September 27, 1948. The diagnosis on admission was acute urinary detention and the final diagnosis was cerebral thrombosis. At the time of his admission his gait was unsteady, his appetite poor and he was confused as to time and place.

It appears from the evidence that the will and codicil in question were personally drafted by decedent and typed by his secretary Grace B. Conway in his Providence law office. The attesting witnesses, who were the same on both instruments, proved that the instruments were executed with all the formalities required by statute. Both witnesses were fellow attorneys who had been friends of the decedent for many years. At the time the instruments were executed the only persons present were decedent, Miss Conway, and the two attesting witnesses. The witnesses and Miss Conway testified that in their opinion he was of sound mind

and knew what he was doing on the dates when he signed the will and codicil.

In the will he named his son William executor and his daughter Catherine executrix if his son was unable to act, and requested that no surety be required on their bonds. He bequeathed $1,000 to each of his four sisters, a brother-in-law, a nephew and his granddaughter, and $500 each to two named charities. He gave his son William his law books and office furniture. He left the household furniture and furnishings of his house in Warren to his wife Alice M. McSoley. To his five children by the second marriage he gave each, by name, $2,500, and to his wife $40,000 and the sum of $2,600 in lieu of the six and twelve months' widow's allowance usually granted by the probate court. To his secretary Grace B. Conway he bequeathed $1,500 if she was in his employ at the time of his decease. He bequeathed the sum of $60,000 to his daughter Catherine and his son William to be divided between them, with the provision that if either should die in his lifetime the bequest was to be paid to the survivor of them. The residue of his estate he bequeathed to Catherine and William as joint tenants and to the survivor of them forever.

In other provisions of his will decedent gave advice to his named executor and executrix to consult with Oscar E. Skinner, Jr. about the stocks and bonds owned by him and directed that Miss Conway's services be retained for a year at the same salary. He authorized his executor to sell all his personal property and advised him to keep an accurate record of moneys received and disbursements made.

In the codicil decedent reduced the specific bequest to his wife from $40,000 to $25,000. He also increased the specific bequests to Catherine and William from $60,000 to be divided between them to $60,000 each, providing that if either died in his lifetime the bequest would go to the survivor of them. In making such changes he referred to the will and confirmed it in all other respects.

It appears from the evidence that in his lifetime, through the practice of law and his investments, decedent had accumulated an estate of over $200,000 and he also owned the house in Warren, which, exclusive of furnishings, he valued at $20,000 to $25,000. In July 1946, for the purpose of minimizing his estate taxes, he conveyed the Warren house to his wife. In June 1946 he purchased for $9,000 a house in Cranston for Catherine and William. In July 1947 upon the marriage of William he gave him a wedding present of $7,000 and in June 1948 he gave him $1,000 to paint and repair his home. It also is in evidence that after the marriage of his daughter Catherine he contributed substantially to her support and that of her minor daughter. From certain insurance policies his wife received $6,000 and Catherine and William received $9,000 between them.

We have discussed in some detail the family and medical background of decedent because the controversy which has arisen as a result of his will and codicil is based on the issues of testamentary capacity and undue influence. His widow and the children of the second marriage are contesting the will on those grounds.

It will serve no useful purpose to review at length the evidence of contestants to prove that decedent lacked testamentary capacity at the time he executed the instruments in question and that such instruments were the result of undue influence. It is sufficient for our purpose to state that they introduced in evidence the medical records of decedent consisting of hospital and Lahey Clinic records. In addition they themselves testified and presented the testimony of other witnesses in their attempt to prove both issues.

The contestants' testimony was in substance that from the summer of 1946 until his death decedent was mentally confused; that at times he was irrational, incoherent and generally incompetent to handle his affairs or his business; that he lost his memory and sometimes failed to recognize

members of his own family, friends and acquaintances; that he was unresponsive at social affairs; that he neglected his personal appearance; that he had to be undressed and put to bed every night in the summer of 1947 and all of 1948; that in 1947 he was not responsible for anything he did; and that from January 1948 until his death he was not well mentally and physically. The contestants did not present as a witness any doctor who knew or attended decedent when he was alive. It is undisputed that there never was any mental examination of the decedent.

The contestants presented the opinion testimony of two psychiatrists, Drs. Thomas L. Greason and Hugh E. Kiene, who qualified as experts. They had not known or seen decedent in his lifetime. They stated that their opinions as to his mental condition at the times in question were based on the medical records in evidence and the assumed facts of the hypothetical questions framed by contestants upon their evidence to that point in the trial. Both were of the opinion that decedent was of unsound mind when he executed the instruments in question.

Alice M. McSoley testified that in 1945 decedent disclosed the contents of his will and said that he was leaving $25,000 each to Catherine and William, certain other small bequests, and the house and residue to Mrs. McSoley, and that later, at her suggestion, he said he had left $3,000 to each of their children. She also testified that her life with decedent was happy and that he was a good father.

In describing their home life in Warren contestants admitted that they saw him at home only mornings and evenings because he spent much of his time, including Sundays and holidays, at his law office in Providence. They also testified that although he ate breakfast at home he usually did not return in the evening until after the family had had their dinner, and that he was in the habit of eating at restaurants in Warren after his evening office hours.

The testimony presented by proponents is in direct con-

flict with that of contestants on the issues of testamentary capacity and undue influence. Such testimony was in substance that decedent's disorientation and mental confusion postoperative to the gall bladder operation in October 1945 had cleared up before the end of 1945; that when he returned to his office in early 1946 he was of sound mind; that from then until he left his office in September 1948 he went there daily and worked with the exception of day trips and the period during which he underwent the operation in January 1948; that while working at his office in 1946, 1947 and 1948, he was alert, clear and of sound mind; that he was in personal charge and control of his law practice, finances, investments and other business affairs; that he had slowed up physically but not mentally; and that his investments prospered during such time.

The proponents also presented in evidence numerous exhibits including investment record books, canceled checks, deposit slips, check stub books and other records kept by decedent pertaining to his law practice and business investments. They testified that most of these records were in decedent's own handwriting and were accurate in all respects. Testimony was also offered to show that he carried on his law practice, tried cases, looked up law and advised clients.

Other persons who had been in contact with decedent in 1946, 1947 and 1948, prior to and subsequent to the dates he executed the will and codicil, testified for proponents. These witnesses included fellow lawyers, clients, businessmen and friends of decedent. They testified that on the occasions when they saw, spoke with and observed him during those years he was of sound mind, clear and alert, that he knew what he was doing, and that he was neat in dress and appearance.

Two disinterested witnesses, Charles E. Spooner, Jr. and Oscar E. Skinner, Jr., who for years had served as decedent's securities counselors, testified in substance with reference

to certain statements made to them by decedent concerning his family life in Warren that he had told them his life with Mrs. McSoley and their children was not happy and that he stayed away from the Warren home as much as possible.

Doctor Ralph J. Petrucci, who was summoned as a witness by proponents, testified that decedent's disorientation and confusion following the 1945 gall bladder operation had cleared up by December 11, 1945; that he treated him for a cold on August 19, 1947 and a chest pain on September 21, 1947; and that in his opinion decedent was of sound mind and not confused on any of those occasions, but that on September 11, 1948 he was of unsound mind.

Doctor Ewert testified that he saw, spoke with and observed decedent on October 30 and December 3, 1947, preliminary to his operation, and on March 2 and June 2, 1948, for checkups following the operation. He stated that in his opinion decedent was of sound mind on each of these occasions; and that he saw him again on August 27, 1948 when decedent was confused, but that he would not say he was of unsound mind on that occasion.

Doctor Ernest A. Burrows, a psychiatrist, qualified as an expert for proponents. He had not known or seen decedent in his lifetime. He gave his opinion that, on the basis of the medical records in evidence and the assumed facts in the hypothetical questions asked him, decedent was of sound mind on the pertinent dates.

Miss Conway testified that she had been decedent's secretary for twenty years prior to his death and that during that time she had typed fifteen or more of his wills; that she typed a new will each year for him; that the general pattern of his wills for years had been to take care of the people provided for in the will in question; that the bequest to decedent's wife had varied over the years from $25,000 to $50,000; that a bequest to the children of the second marriage first appeared in the 1943 will giving them

$3,000 each; that this amount was reduced to $2,500 each by a will between the 1943 will and the 1947 will; that Mrs. McSoley's bequest of $50,000 in a prior will was reduced to $40,000 in the 1943 will when the children were given $3,000 each; that the 1947 will did not reduce the bequest to these children to $2,500 and did not change the bequest of $40,000 to Mrs. McSoley.

Miss Conway also testified that there was always a provision in prior wills giving Mrs. McSoley the house in Warren together with the furniture and furnishings; that after decedent had deeded the house to his wife in July 1946 he instructed Miss Conway to omit that provision from the 1947 will; that the provision giving his wife $2,600 as her widow's allowance and other paragraphs in the 1947 will had been in prior wills for years; that William was named sole executor in wills prior to 1942 when he entered the service and that by a codicil in 1942 and the wills thereafter Catherine's name was added as executrix in case anything happened to William; and that the provisions of the 1947 will giving Catherine and William $60,000 plus the residue to be divided between them and to the survivor of them had been the same as far back as Miss Conway could remember.

Mrs. Irene O'Neill, who substituted for Miss Conway as decedent's secretary in 1935 and 1937 while she was out sick, corroborated the latter's testimony in certain respects. In addition she testified that in June or July of 1948 decedent came into her office, which was on the same floor as his, and told her he was having Miss Conway type a codicil to his will; that he had given it a lot of thought; that he figured the house he had already given his wife was worth $25,000; that he had determined what else he had and decided to divide everything, including the house, into three units; that by the codicil his wife and their children would get about $60,000, Catherine would get $60,000, and William would get $60,000; and that he figured the children

of the second marriage would take through their mother. Mrs. O'Neill also testified that in her opinion on the occasions when she saw and talked with decedent in 1947 and 1948 he was of sound mind and knew what he was doing and saying.

The case was submitted to the jury on the issue of testamentary capacity and undue influence. After a trial which lasted eighty-one days the jury returned a general verdict sustaining both instruments and made special findings that decedent possessed testamentary capacity on the dates of the execution of the will and codicil and that such instruments were not the result of undue influence.

The contestants filed a motion for a new trial based on the usual grounds that the verdict was against the law and the evidence and the weight thereof and that it failed to do substantial justice between the parties. After hearing thereon the trial justice denied such motion.

The contestants have briefed and argued their exception to the denial of such motion under point I. We deem it unnecessary to consider at length the issue of undue influence, since contestants have failed to point out wherein the evidence preponderates against the verdict and the special finding on this issue. *Duffy* v. *United Electric Rys.*, 56 R. I. 450, 454. Moreover, we have carefully examined the entire record consisting of twenty-five volumes of testimony and innumerable exhibits and medical records. From our examination we are convinced that the evidence on such issue does not preponderate against the verdict. It is therefore our opinion that the trial justice's approval of the verdict was correct.

We now come to the issue of testamentary capacity. After a careful examination of the record we are of the opinion that contestants cannot seriously challenge the conflicting evidence thereon. In fact it seems to us that they do not deny the existence of such evidence. But they strenuously contend that in evaluating certain evidence, espe-

cially the medical records and the exhibits, the trial justice misconceived the legal effects thereof and failed to apply the correct law. Specifically they argue that he failed to test such evidence, including the opinions of the lay witnesses, the medical records and the exhibits, with the rule of testamentary capacity laid down in *Rynn* v. *Rynn,* 55 R. I. 310, 321.

Finally, contestants contend that the trial justice failed to exercise his independent judgment in accordance with the rule set forth in *Knightsville Loan Corp.* v. *Bankers Indemnity Ins. Co.,* 65 R. I. 48, 52, in order to determine whether the verdict responded to the real merits of the controversy and did substantial justice between the parties. They argue that instead he placed too much stress on the rule laid down in *Arlia* v. *United Electric Rys.,* 64 R. I. 462, 466, which is that even though his personal judgment might incline him to a different conclusion, a trial justice should not disturb a verdict when the evidence is such that different minds may reasonably and fairly come to different conclusions.

We have examined the rescript of the trial justice with these contentions in mind. It is clear that he carefully and in great detail reviewed all of the exhibits and medical records as well as the testimony of the opposing witnesses. In considering the issue of testamentary capacity of decedent on the date of the execution of the will he passed upon the credibility of the witnesses and the weight of their testimony. He accepted Miss Conway's testimony as to what occurred on the dates of the execution of the two instruments and as to her knowledge of the contents of prior wills. He concluded that the disposition made in the will was not unusual in the viewpoint of decedent and that, regardless of the disparity, the will apparently followed a pattern established in his former wills.

Upon examining the medical records he found that after the operations in 1945 and in 1948 decedent was confused

and disorientated. He also noted that the hospital and clinical records standing alone did not present a picture of sound mental health. But there is no merit in contestants' contention that because of such findings the trial justice should have concluded that decedent lacked testamentary capacity on the dates of the execution of the will and codicil. They overlook the trial justice's further finding that "As time went on, however, and the weeks and months following each operation passed, his confusion and disorientation seemed to leave him."

Before passing upon the validity of the will the trial justice examined all the exhibits in the case, including copies of letters written by decedent, legal correspondence, cancelled checks, deposit slips, records of his law cases, his 1946 and 1948 diaries, account books, check stub books, and records of his securities holdings. Most of these exhibits were in decedent's own handwriting and covered the period before and after the execution of the will and codicil. He concluded therefrom that the deposit slips dated before and after July 9, 1947 and to the end of that year indicated that he had coherent and rational banking relations during such period. He also found that the deposit slips in 1948 up to September 1, 1948 appeared to be in decedent's handwriting and that they were made out rather well and exhibited no disorientation.

We do not agree with contestants' contention that the trial justice failed to consider the character of such exhibits and the acts of which they were evidence, and that they shed no light on the issue of testamentary capacity as required by the rule in *Rynn* v. *Rynn, supra.* Evidence that decedent was transacting business and conducting his affairs is competent and relevant to the issue of testamentary capacity. *Hollingworth* v. *Kresge,* 48 R. I. 341, 343.

After passing on the testimony, the exhibits and the medical records, the trial justice expressly approved the verdict on the issue of testamentary capacity on July 9,

1947, the date of the execution of the will, saying that while the evidence was conflicting it preponderated in favor of the validity of the will.

The trial justice felt that the codicil presented a more difficult problem because it was dated but three months prior to decedent's death and also because it made a substantial change in the disposition of his property. In passing on the issue of testamentary capacity with reference to the codicil he reviewed the testimony of the opposing witnesses and the weight thereof. He stated that Mrs. McSoley was "a lady in the full sense of the word"; that she was a home person; and that she was devoted to her children. He also stated that there was evidence indicating affection between decedent and his wife and their children.

However, on the question of his home life with his wife and their children, although the trial justice felt that Mrs. McSoley was not the cause of decedent's feelings with regard to her, he accepted the testimony of Mr. Spooner and Mr. Skinner with respect to statements made to them by decedent that he had been unhappy in his home in Warren. He also concluded that decedent had great affection for Catherine and William. He accepted proponents' explanation of the disparity in the bequests, namely, that it was decedent's intention to leave a large legacy to Mrs. McSoley which would eventually go to her children, and his deep affection for Catherine and William, who had been motherless since their early years and who were largely dependent upon their father alone for financial assistance and parental care.

He then reviewed the evidence presented by proponents relative to decedent's soundness of mind and stated that he could not ignore such testimony. He referred specifically to the testimony of Dr. Ewert and Dr. Petrucci who had treated decedent in 1948, and also to the testimony of certain lay witnesses who had been in contact with him in the same year. These witnesses included former clients, fellow

attorneys, friends, business associates and the attesting witnesses. Their testimony was in substance that they had dealt with, seen, talked with, or observed decedent at various times in 1948, and it was their opinion that on such occasions he was of sound mind and knew what he was doing.

After considering all of proponents' evidence that decedent was of sound mind during a period before and after the date of the codicil, the trial justice weighed such evidence against that of contestants who described his conduct and incidents showing unsoundness of mind during portions of 1948 and of opinion evidence with respect thereto. He reached the conclusion that the jury could reasonably and fairly have decided the case either way on the question of decedent's soundness of mind on June 30, 1948, the date of the codicil. He therefore stated, even though in his opinion the terms of the codicil were unjust, that because of the rule in *Arlia* v. *United Electric Rys., supra,* he had no right to substitute his ideas of what amounted to a fair distribution for the terms which decedent himself had established.

The contestants' contention that as to the codicil the trial justice has plainly indicated the verdict is not in accord with his own mind or that he is in evident disagreement therewith finds no support in his language. He merely stated that in his opinion the terms of the codicil, not the verdict, were unjust. But he recognized that he had no right to substitute his ideas for those of the decedent if the latter possessed testamentary capacity. *Carr* v. *McCormick,* R. I., 96 Atl. 817.

Implicit in the jury's verdict and in the trial justice's approval thereof is a finding that decedent had sufficient mind and memory to understand the nature of the business he was engaged in when he executed his will and codicil; that he had a recollection of the property he wished to dispose of thereby; and that he knew and recalled the

natural objects of his bounty, their deserts with reference to their conduct and treatment of him, their necessities, and the manner in which he wished to distribute his property among them. There is evidence in the record to support such finding. The provisions of the will and codicil clearly indicate that decedent remembered and provided for the natural objects of his bounty. The evidence explains the disparity in the bequests. In our opinion the requirements of the rule in *Rynn* v. *Rynn, supra,* have been met, and there is no merit in contestants' contentions to the contrary.

The contestants' contention that the trial justice erred in failing to consider an episode involving a remark by a juror during the course of the trial is not properly before us. *G. W. McNear, Inc.* v. *American & British Mfg. Co.,* 44 R. I. 190, 206; *Floyd* v. *Turgeon,* 68 R. I. 218, 229.

The contestants' next contention relates to the statement of the trial justice that in arriving at his decision to approve the verdict he had not given any weight to the opinions of the psychiatrists. They conclude from this language that he disregarded such opinion testimony and therefore committed reversible error. We do not agree with their interpretation of his statement. An examination of the charge shows that the jury were properly instructed as to how the testimony of the experts should be treated. We are satisfied that he did not disregard or ignore this testimony and that he considered and weighed it, but in the exercise of his independent judgment did not give it any weight in reaching his ultimate decision in passing on the motion for a new trial. In our opinion he has performed his duty properly. *Hulton* v. *Phaneuf,* 85 R. I. 406, 417.

After carefully examining the entire record we are satisfied that the trial justice did not err in passing upon contestants' motion for a new trial. He reviewed all the evidence and in doing so he has exercised his independent judgment on the credibility of the witnesses, the weight of

the evidence and the verdict of the jury. *Nichols* v. *New England Tel. & Tel. Co.,* 57 R. I. 180, 183; *Soucy* v. *Alix,* 79 R. I. 499, 503. In such circumstances his decision carries great weight and will not be disturbed by us unless he misconceived the law, or overlooked or misconceived material evidence.

After careful consideration we are of the opinion that on the basis of the conflicting evidence on the principal issue of testamentary capacity he recognized and applied the law applicable to the facts of the case. *Arlia* v. *United Electric Rys., supra; Quinn* v. *Poole,* 85 R. I. 280. We have found nothing in the record indicating that he has overlooked or misconceived any material evidence. Nor have contestants succeeded in convincing us that the evidence so overwhelmingly preponderates against the verdict that it fails to do substantial justice between the parties. *Young* v. *Young,* 56 R. I. 401, 409; *Duffy* v. *United Electric Rys.,* 56 R. I. 450, 454. For these reasons the exception to the denial of their motion for a new trial is overruled.

Under point II contestants have listed two groups of exceptions under which they contend the trial justice erred in admitting certain evidence. They have not briefed either group in accordance with the requirements of Rule 15 of the Rules of the Supreme Court. In each group they have merely set forth their exceptions substantially as they appear in their bill of exceptions. It is true that in a general way they have described the nature of the exhibits. But they have not specified the pertinent facts contained therein which they claim are inadmissible. In such circumstances these exceptions may be treated here as not having been properly briefed and are therefore waived. *Joseph* v. *Di Guilio,* 60 R. I. 286; *Senn* v. *Kogut,* 79 R. I. 429, 431.

Under point III contestants list sixteen exceptions to the admission of testimony and two exceptions to the introduction of certain exhibits. They contend that the trial justice erred in admitting this evidence on the ground that it

related to events which were too remote in time to have any bearing on the issues in the case. In our opinion these exceptions are subject to the same infirmities as those briefed under point II. Again contestants have not complied with the requirements of Rule 15. However, since we have examined the entire record, we shall assume for the purposes of this discussion that the exceptions are properly before us.

These exceptions are based specifically on the grounds of remoteness and irrelevancy. It is well settled that the trial justice must exercise discretion in ruling on the admissibility of evidence objected to on such grounds. Consequently such rulings should not be held to be reversible error unless he abuses his discretion to the prejudice of the objecting party. *Scherer* v. *J. Sarubi Co.*, R. I., 181 Atl. 556, 557; *Swartz* v. *Edwards Motor Car Co.*, 49 R. I. 18, 22. It is our opinion that the trial justice did not abuse his discretion in admitting such evidence. The exceptions under point III are overruled.

Under point IV contestants have listed a number of exceptions to the admission of the testimony of nineteen lay persons as to their opinion of the soundness of mind of decedent. We shall assume that these exceptions have been properly briefed notwithstanding the fact that Rule 15 has not been complied with.

It is well settled that a lay witness may express an opinion as to a testator's mental condition when such opinion is based solely on facts within his knowledge and as to which he has previously testified. *Rynn* v. *Rynn*, 55 R. I. 310, 323; *Di Orio* v. *Cenci*, 54 R. I. 441; *Hopkins* v. *Wheeler*, 21 R. I. 533. An examination of the pertinent testimony indicates that all the opinions expressed by proponents' lay witnesses were given after the witnesses had testified to facts which they had observed in their contact with decedent, and that the opinions expressed by them were based upon those facts. It appears from the evidence that after

stating the nature of their contact with decedent the witnesses were asked whether, on the basis of what they observed, in their opinion decedent understood what he was doing and whether he was of sound mind.

The contestants' principal contention under point IV is in substance that these witnesses were not qualified to give such opinions in the absence of testimony that they had personal knowledge that decedent possessed all the elements of testamentary capacity as set forth in *Rynn* v. *Rynn, supra,* at page 321. For the reasons stated in considering contestants' exceptions to the denial of their motion for a new trial, we do not agree with this contention. They have cited no authority and we have found none in support thereof. The possession of such knowledge or the lack thereof on the part of the witnesses in question may affect the weight of their opinion testimony, but it does not affect its admissibility if the test set forth in *Rynn* v. *Rynn, supra,* is met. These exceptions are overruled.

We will now consider proponents' exception to the ruling of a justice of the superior court denying their motion to strike the entry of appearance of Alice M. McSoley as administratrix and a similar motion to strike and to dismiss the bill of exceptions as to her which was filed in this court.

The decree of the probate court denying the probate of the will and codicil was entered on February 24, 1949. On March 2, 1949 proponents filed in that court their claim of appeal from such decree. Thereafter contestants filed a petition in said court for the appointment of an administrator of decedent's estate. After a hearing, on March 24, 1949 the court entered a decree appointing decedent's widow administratrix. The proponents' reasons of appeal from the decree denying probate of the two instruments were filed in the superior court on March 25, 1949 and were docketed as probate appeal No. 2622.

On March 29, 1949 proponents filed a claim of appeal in the probate court from the decree appointing the admin-

istratrix and subsequently filed their reasons of appeal in that proceeding in the superior court where such appeal is now pending and is docketed as probate appeal No. 2629.

It appears that on May 5, 1949, prior to the assignment day, Alice M. McSoley, individually and in her representative capacity as administratrix, filed an entry of appearance in the superior court in probate appeal No. 2622. Thereafter the trial of the case was commenced on October 31, 1949 before a jury and resulted in a verdict on March 3, 1950 sustaining decedent's will and codicil. After contestants' motion for a new trial was denied Mrs. McSoley, individually and as administratrix, and her five children on October 26, 1950 filed their notice of intention to prosecute a bill of exceptions to this court.

It also appears that on October 23, 1950 proponents filed a bill in equity in the superior court, Equity No. 21381, against Mrs. McSoley and others seeking certain injunctive relief on the ground that the probate court was without lawful authority to appoint her as administratrix during the pendency of the appeal from the decree denying probate of decedent's purported will and codicil. From a decree granting proponents a preliminary injunction in accordance with the prayers of the bill, the respondents, contestants here, claimed an appeal to this court and the decree appealed from was modified. *McSoley* v. *McSoley*, 79 R. I. 124. Thereafter on January 2, 1952 a decree was entered in the superior court in accordance with our opinion.

The decree as modified enjoined and restrained the administratrix from doing any acts under her appointment other than those prescribed by general laws 1938, chapter 573, §12, now G. L. 1956, §33-23-3, until the legality and scope of her appointment was finally determined in the appellate proceedings then pending in the superior court. It clearly appears from *McSoley* v. *McSoley, supra,* at page 128, that the court was referring specifically to the appellate proceedings then pending in the superior court in pro-

bate appeal No. 2629, and not to the will contest in probate appeal No. 2622, which was then pending in this court and is the instant case.

While probate appeal No. 2629 was pending in the superior court and during the pendency of the instant case the proponents on February 1, 1954 filed in the superior court the previously-mentioned motion to strike the entry of appearance of Alice M. McSoley in her capacity as administratrix on the ground that in such capacity she was not a proper party to the action. This motion was denied.

After the bills of exceptions of both sides in the instant case had been prosecuted to this court, proponents on May 2, 1955 filed their motion to strike the appearance of Alice M. McSoley as administratrix and to dismiss the bill of exceptions as to her in that capacity. Under such motion and under their exception to the ruling of the justice of the superior court denying the motion filed in that court, proponents contend that he erred in his ruling and that the motion should be granted on the ground that under G. L. 1956, §33-23-2, the probate court had no jurisdiction to appoint an administratrix pending the appeal from the decree denying probate of decedent's will and codicil.

There is nothing in the record indicating that during the trial of this case in the superior court proponents objected to the status of Alice M. McSoley as a party in her representative capacity. Moreover, in view of the verdict in their favor, they cannot now complain that they were prejudiced in any way by her status as a party in her capacity as administratrix in so far as the instant case is concerned. In the circumstances the only question before us at this time is whether we should pass on such exception and on the motion filed in this court.

After carefully considering all the arguments of proponents, it is our opinion that the ruling of the superior court on the motion in question was not erroneous. The very issue which proponents attempt to raise collaterally in this

case is the principal issue in probate appeal No. 2629 which is pending in the superior court. As we have already indicated, the decision of this court in *McSoley* v. *McSoley, supra,* in effect held that the legality and scope of the administratrix' appointment were to be finally determined in the appellate proceedings then pending in the superior court in probate appeal No. 2629.

The question whether Mrs. McSoley was lawfully appointed has been pending in the superior court since 1949 in probate appeal No. 2629. In our judgment orderly procedure compels us to follow the mandate of this court as expressed in *McSoley* v. *McSoley, supra.* To permit the proponents to raise the issue in question in this proceeding in the manner proposed by them would do violence to orderly procedure. By litigating such issue in accordance with the mandate of this court in *McSoley* v. *McSoley, supra,* the proponents lose no rights and suffer no prejudice if they finally prevail in probate appeal No. 2629.

The proponents' exception to the denial of their motion in the superior court to strike the entry of appearance of Alice M. McSoley in her capacity as administratrix of decedent's estate is overruled. Their motion filed in this court to strike such appearance and to dismiss the bill of exceptions as to her in such capacity is denied.

All of the contestants' exceptions are overruled, and the case is remitted to the superior court for entry of judgment on the verdict.

### ON MOTION FOR REARGUMENT.

#### JUNE 24, 1960.

PER CURIAM. After our opinion in the above case was filed, the proponents by permission of the court presented a motion for leave to reargue certain issues relating to the appearance of Alice M. McSoley in her capacity as admin-

istratrix of the estate of William H. McSoley, deceased. In the motion they have stated certain reasons on which they base their contention that justice requires a reargument of the case in so far as it relates to such issues.

We have carefully considered all of those reasons and find them to be without merit. In our judgment they present no matter which was not fully considered and passed upon in reaching the conclusions stated in our opinion.

Motion denied.

*William H. McSoley, Jr., Edmund Wexler,* for proponents.

*William S. Flynn, Christopher J. Brennan,* for contestants.