Mildred J. BAJAKIAN

v.

Stephan G. ERINAKES, Executor of
the Will of Blanch Erinakes.

No. 2003–488–Appeal.

Supreme Court of Rhode Island.

Sept. 2, 2005.

Lauren E. Jones, Providence, for Plaintiff.

Howard E. Walker, Hope Valley, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

ROBINSON, Justice.

### Introduction

This case involves a dispute between two siblings with respect to their mother's will. The dispute eventually was submitted to a jury for decision. The jury decided that the position of the plaintiff, who had challenged the will, was the more convincing; it determined that the mother had lacked testamentary capacity when she executed the will in question. We perceive no error that would require us to reverse the judgment entered on the jury's verdict. Therefore, we affirm.

### Facts and Travel

Mildred J. Bajakian (plaintiff) and Stephan G. Erinakes (defendant) are the adult children of George and Blanch Erinakes. George died in 1973, but his wife lived until 1999. Blanch Erinakes executed a will in 1989, the terms of which provided for plaintiff and defendant equally. Some five years later (on November 16, 1994, to

be precise), Blanch executed the will at issue. Pursuant to the terms of the 1994 will, Mildred was to receive the sum of $25,000 and the balance of the rather large estate was to go to Stephan.[1] After Blanch Erinakes died on July 6, 1999, her will was admitted to probate by the East Greenwich Probate Court on October 22, 1999. The plaintiff then appealed to the Kent County Superior Court, and the case was eventually tried before a jury between May 12 and May 16, 2003.[2]

Before the trial commenced, plaintiff sought by way of a motion *in limine* to exclude a typed statement purportedly made by Blanch Erinakes on May 5, 1994 and discovered by defendant after Blanch's death. The defendant wished to introduce the statement pursuant to Rule 803(3) of the Rhode Island Rules of Evidence as "evidence of Mrs. Erinakes' testamentary intent" and as evidence "that she knew what her property was, who her [issue] were, [and] how they should be treated under her will." The trial justice deferred ruling on this motion *in limine* until such time as defendant might seek to introduce the statement during the trial.

During the trial, both parties presented witnesses and introduced documentary evidence in support of their respective positions. Also, since the issue had not been decided at the *in limine* stage, defendant sought to have Blanch's statement of May 5, 1994 admitted as a full exhibit pursuant to Rule 803(3). The plaintiff objected, and

the trial justice sustained plaintiff's objection, stating:

"[D]eclarations of memory are not admissible under 803(3), and forward looking statements of intention are admitted * * *. This statement appears to contain both. * * * Unfortunately, this statement cannot be redacted, if you would, or separated or edited in some form to take out the declarations of memory from these statements of intention."[3]

At the close of all the evidence, defendant moved for judgment as a matter of law pursuant to Rule 50 of the Superior Court Rules of Civil Procedure. The trial justice reserved ruling on defendant's motion and sent the case to the jury.

The jury found that defendant had proved by a fair preponderance of the credible evidence that, on November 15, 1994, Blanch Erinakes executed her will in accordance with the provisions of G.L. 1956 § 33–5–5. The jury further found, however, that defendant had failed to prove by a fair preponderance of the credible evidence that Blanch possessed the testamentary capacity necessary to execute a valid will on November 15, 1994. The jury did not reach the question of whether Blanch had executed her will under undue influence.

After the jury returned a verdict in plaintiff's favor, defendant renewed his Rule 50 motion, combining it with a motion for new trial under Rule 59 of the Superior Court Rules of Civil Procedure. These

1. In addition, by virtue of Blanch's exercise of a power of appointment, the balance of the estate of George Erinakes (the father of Mildred and Stephan) was also left to Stephan.

2. The plaintiff also alleged that the will had been executed under undue influence. The jury did not reach that issue, and it is not before us.

3. The trial justice also stated that "there are not other indications * * * of genuineness or reliability" that would allow it to be admitted under the "catch all" exception existing under Rules 803 and 804 of the Rhode Island Rules of Evidence. Finally, the trial justice ruled that "any probative value [the statement] may have is outweighed by its prejudicial effect."

motions were heard on June 6, 2003. The trial justice denied both motions ruling that "the jury's verdict should remain unchanged because there is competent evidence to sustain it and there was a failure of proof by Stephan on the issue of testamentary capacity." The trial justice then directed that a judgment be entered in accordance with the jury's verdict.

On appeal to this Court, defendant argues that the trial justice erred (1) by excluding Blanch's statement of May 5, 1994 from evidence; (2) by denying defendant's motion for judgment as a matter of law; and (3) by denying defendant's motion for a new trial.

## Analysis

### I

### The May 5, 1994 Written Statement of Blanch Erinakes

During the trial, defendant sought to introduce into evidence a typed statement that Blanch Erinakes purportedly made on May 5, 1994 and that defendant testified he found after his mother's death.[4] The statement reads as follows:[5]

"In 1973 when my late husband, Gearge C. Erinakes pasted away I was left with the responsibility of carrying on his life's work, which was the movie theatres and real estate business. At that time I had to not only deal with his loss, but tried to understand the concept of a trust. What a nightmare!

"Yet I put my best foot forward and started to do things I never dealt with before, primarily all the bookkeeping. If I tried to describe what I went through, it would probably take another four pages, yet I survived.

"During the next twenty years of trying to keep everything going, the only full time support I received was from my son, Stephan G. Erinakes. There were many many years of sacrifices we both went through. Seven days a week running the theatres, maintaining the properties, and making sure all the bills were paid. Well we worked together and I am proud to say we were able to retain the properties, pay off seven mortgages and built a few new stores.

"The one thing that I did learn in these past twenty years was that for our success to have had happen we needed to leave everything in tact for it all to work. Seeing Stephan is the only one who knows what is going on and primarily what it takes to make it work, it only makes sense to me to let him continue to carry on in this capacity, in control and to have ownership of everything. I know in my heart that when the day comes when he is able to show a profit he can share it as he sees fit. I feel at this time that if I were to leave a percentage to everyone, there would not be any guarantee that after I was gone, different family members might request their shares in cash. This means that some of the properties might have to be sold to pay off their request. I feel we worked to hard for this to happen."

■ The trial justice considered the question of the admissibility of this statement in light of the provisions of Rule

---

4. The defendant said that he found both a signed and an unsigned text of Blanch's statement in her safe when he was going through Blanch's belongings after her death. The signed version indicates that it was notarized by one Jane E. Johnson. There was some dispute at trial as to the validity of the nota-rization, but that dispute has no bearing on the issues that we address in this appeal.

5. We reproduce the May 5, 1994 statement precisely as it appears in the record, without inserting any spelling or grammatical corrections and without employing "[sic]" signal.

803(3).[6] He correctly noted that Rule 803(3) distinguishes between statements of intent concerning the future and declarations of memory concerning the past. *See Estate of Sweeney v. Charpentier*, 675 A.2d 824, 828 (R.I.1996) (holding that the trial justice erred in admitting certain hearsay statements which were actually statements of memory or belief). And the trial justice observed that the statement at issue did contain certain declarations that looked to the past.

The trial justice then stated: "Unfortunately, this statement cannot be redacted, if you would, or separated or edited in some form to take out the declarations of memory from [the] statements of intention."

■■■■ With the possibility of a cautionary instruction not having been suggested to him[7] and with the redaction alternative having been negated by him (without objection),[8] it is our view that the trial justice did not abuse his discretion in declining to admit the statement.[9] Indeed, with respect to the statement *as such* (i.e., without redaction or a cautionary instruction), the trial justice's ruling was consistent with well established law in this jurisdiction. *See Estate of Sweeney*, 675 A.2d at 828 (holding that the hearsay statements at issue in that case fell "clearly outside

---

**6.** Pursuant to Rule 803, certain statements are exempted from exclusion under the hearsay rule. One of those exceptions is set forth in Rule 803(3), which provides as follows:

"(3) *Then Existing Mental, Emotional, or Physical Condition.* A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

**7.** The defendant's brief to this Court argues that "[i]f the court below was concerned that the jury might improperly consider Blanch's statements of 'history' as evidence of those historical facts, then the appropriate step would have been to admit the exhibit with a cautionary instruction to the jury, not to exclude the document altogether." Very significantly, however, defendant did not urge such an approach upon the trial court. It should go without saying that, as between the proponent of evidence and the trial justice, the responsibility for suggesting and advocating for possible creative solutions (like redaction or a cautionary instruction in this instance) falls upon the proponent. *See, e.g., United States v. Pugliese*, 712 F.2d 1574, 1580 (2d Cir.1983).

**8.** Redaction of the inadmissible portions of the text may have been a quite feasible alternative, but there is no indication in the record that the proponent of the evidence reacted other than passively to the court's observation that the statement could not be redacted. (It is noteworthy that the trial justice had previously agreed to redaction with respect to a portion of the death certificate of Blanch Erinakes.)

While it is part and parcel of our adversary system that lawyers must in the end defer to definitive evidentiary rulings by a judge, a trial lawyer is by definition an advocate; and part of his or her role as an advocate should be to suggest in a respectful but cogent and creative manner possible ways in which an apparent evidentiary roadblock could perhaps be circumvented-even after the trial judge (as was the case here) had indicated that he was unable to see how the apparent evidentiary roadblock could be avoided.

(In the circumstances of this case, redaction would not have caused a problem with respect to the evidentiary "rule of completeness." *See* Rule 106 of the Rhode Island Rules of Evidence; *see also Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 171, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988) (discussing rule of completeness).)

**9.** We review decisions concerning the admissibility of evidence under the abuse of discretion standard. *Bourdon's, Inc. v. Ecin Industries, Inc.*, 704 A.2d 747, 758 (R.I.1997); *see also Saber v. Dan Angelone Chevrolet, Inc.*, 811 A.2d 644, 652 (R.I.2002); *ADP Marshall, Inc. v. Brown University*, 784 A.2d 309, 314–15 (R.I.2001).

the Rule 803(3) exception because they constitute[d] statements of memory or belief") (internal quotation marks omitted); *see also State v. Hazard,* 785 A.2d 1111, 1118–19 (R.I.2001) ("[T]o fall within the Rule 803(3) exception to the hearsay rule, the statement must be one showing the declarant's state of mind at the moment of the statement; but it does not include statements relating to the reasons why the declarant held that state of mind or what might have induced it."); *State v. Bustamante,* 756 A.2d 758, 764 (R.I.2000).[10]

Bearing in mind the controlling standard of review (*see* footnote 8, *supra*), we conclude that the trial justice did not abuse his discretion in declining to admit the decedent's written statement.

## II

### The Motion for Judgment as a Matter of Law

■ Stephan has appealed from the trial justice's denials of his motions for judgment as a matter of law, arguing that the record is "bereft of probative evidence that the testatrix lacked testamentary capacity or that her will was the product of undue influence."[11]

■ In the case of *Swerdlick v. Koch,* 721 A.2d 849 (R.I.1998), we summarized the criteria pursuant to which a motion for judgment as a matter of law under Rule 50 should be considered. We wrote in pertinent part as follows:

" 'The standard for granting a motion for judgment as a matter of law is the same as that applicable to its precursor, a motion for a directed verdict.' * * * The trial justice, and this Court on review, should consider the evidence presented at trial in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, and should draw all reasonable inferences from the evidence to support the position of the nonmoving party. * * * If, after review, factual issues remain upon which reasonable minds could differ, then the trial justice should submit the issues to the jury for determination and deny the motion for judgment as a matter of law. * * * If, on the other hand, no relevant issues of fact exist and defendant is entitled to judgment as a matter of law, then the trial justice should grant the motion and dismiss the complaint." *Swerdlick,* 721 A.2d at 856; *see also Graff v. Motta,* 695 A.2d 486, 490–91 (R.I.1997).

■ When we review a trial justice's decision with respect to a Rule 50 motion, we use the same criteria as did the trial justice. *Graff,* 695 A.2d at 491. The most important of those criteria is the principle that, if the evidence viewed in the light most favorable to the party opposing the Rule 50 motion "would justify a reasonable jury's finding for the plaintiff, the jury is

10. In denying defendant's motion for a new trial, the trial justice expressed some skepticism as to the bonafide nature of the May 5, 1994 statement. However, since we have held that his initial reason for excluding the evidence passes muster under the terms of Rule 803, we need not and do not pass upon the later expressed views of the trial justice about this item of evidence.

11. It should be borne in mind that Stephan, as the proponent of the will, bore the burden

of proof with respect to the issue of testamentary capacity. *Young v. Young,* 56 R.I. 401, 408, 185 A. 901, 904 (1936) (referring to "our well established law" to the effect that "the burden [is] upon the proponent * * * to prove that the testatrix possessed testamentary capacity * * *."); *see also Talon v. Jackson,* 66 R.I. 302, 304, 19 A.2d 4, 5 (1941); *Heroux v. Heroux,* 58 R.I. 79, 85, 191 A. 265, 268–69 (1937); *Talbot v. Bridges,* 54 R.I. 337, 340, 173 A. 72, 74 (1934).

entitled to decide the facts and the motion should be denied." *Cinq–Mars v. Rodriguez,* 674 A.2d 401, 405 (R.I.1996); *see also Graff,* 695 A.2d at 491.

Applying the foregoing principles to the evidence that was before the jury in this case, we conclude that the trial justice acted correctly in denying Stephan's motions for judgment as a matter of law. The fact is that the plaintiff, Mildred Bajakian, did introduce enough admissible evidence tending to show that her mother lacked testamentary capacity to "justify a reasonable juror's finding for the plaintiff * * *." *Cinq–Mars,* 674 A.2d at 405.

■■■ Solely by way of example, we cite the following evidence that was admitted at trial and that could lead reasonable jurors to conclude that Blanch lacked testamentary capacity. (We emphasize that these are just some examples of the evidence to that effect which could have resulted in the jury's finding as it did.)

For example, one witness (a fellow employee of Mildred at a bookstore) testified as follows about the changes that she perceived in Blanch during the year 1992:

"Q. And did you also have occasion upon which you met Mrs. Blanch Erinakes?

"A. Yes, many occasions.

"Q. And when was the first time you met Mrs. Blanch Erinakes?

"A. Was in '92, at the beginning.

" * * *

"Q. And did you have any conversation with Mrs. Erinakes during this period of time?

"A. I had many conversations.

"Q. And do you recall those conversations?

"A. Um, most of them.

"Q. Okay. And can you tell us the first conversation that you had with Mrs. Erinakes?

"A. I remember in the beginning of '92 we had a conversation about, um, family, about her life, about different things.

"Q. And what did she say to you?

" * * *

"A. At that particular time, she seemed okay. It was towards the summertime of '92 that we started to have a conversation and all of a sudden she got this blank stare and literally, um, lost where she was; and then as she kind of came out of that, I could see the panic in her eyes * * *."

Another witness, a hairdresser who had done Blanch's hair from 1985 to 1997, testified as follows about her perception of Blanch's behavioral changes in 1992:

"Q. Did you have occasion to know a Blanch Erinakes?

"A. Yes, I did. I did her hair for—from 1985 to 1997.

"Q. Okay. And during those periods of time, did you have occasion to have conversation with Mrs. Erinakes?

"A. Yes. I did her hair every Saturday afternoon.

"Q. All right. And what did you do for her?

"A. I used to cut her hair, I did her color, and we had in-depth conversation for many years.

"Q. And do you recall any difference in her behavior at any time throughout your relationship?

" * * *

"A. Yes.

"Q. When did you begin to notice that difference?

"A. I began to notice a difference in her behavior between, well, 1992 and 1994.

"Q. And how do you recall that period of time?

"A. Her behavior changed, um—

"Q. No. no. Mrs. LeMay, why is it you remember it to be that period of time?

"A. I remarried in 1992, so I specifically remembered the year her behavior changed. Uh, she became a little infantile. I would ask her questions. Blanch was a very, uh, specific, specific, very intelligent person. I would ask her questions just in conversation, um, a specific question like, uh, 'Where did you go yesterday?' Upon occasion a couple of times, she would stick out her tongue and laugh, which was not Blanch."

In other words, with respect to the decedent's testamentary capacity, there were "factual issues * * * upon which reasonable minds could differ." *Swerdlick,* 721 A.2d at 856. Accordingly, the trial justice properly denied defendant's Rule 50 motion and left the resolution of the factual issues to the jury for determination. *See Swerdlick,* 721 A.2d at 856; see also *Marcinko v. D'Antuono,* 104 R.I. 172, 180–81, 243 A.2d 104, 109 (1968).

### III

### The Motion for a New Trial

Finally, defendant has appealed from the trial justice's denial of his motion for a new trial. The defendant argues that the trial justice overlooked or misconceived material evidence supporting Blanch's testamentary capacity.

■■■■ The criteria that should guide a trial justice in considering a Rule 59 motion for new trial were clearly (and

colorfully) articulated by the late Justice Thomas Kelleher in the case of *Ruggieri v. Big G Supermarkets, Inc.,* 114 R.I. 211, 330 A.2d 810 (1975). He wrote as follows:

"In this jurisdiction a trial justice, as he considers the pros and cons of such a motion, acts as a 'super juror' or a 'thirteenth juror' in that he makes an independent appraisal of the evidence in the light of his charge to the jury. He can weigh the evidence and assess the witnesses'. credibility. He can reject some evidence and draw inferences which are reasonable in view of the testimony and evidence in the record. After he finishes his sifting of the evidence, the trial justice must make a choice. He can * * * follow the route designed for times when he thinks the testimony so evenly balanced that the verdict should not be disturbed, or he can go the way established for those occasions when his 'superior judgment' tells him that the verdict is against the preponderance of the evidence and thereby fails to either do justice to the parties or respond to the merits of the controversy. If he determines that the evidence presented an 'evenly balanced-reasonable minds could differ' situation, he denies the motion. On the other hand, if he is of the opinion that the verdict is not a proper response to the evidence, he grants the motion." *Id.* at 215–16, 330 A.2d at 812.[12]

Those criteria that were described by Justice Kelleher three decades ago remain fully viable today—although we would be inclined to replace the "he" pronoun with "he or she."

■■■■ Moreover, when we review a trial justice's ruling on a motion for new

---

**12.** *See also Saber,* 811 A.2d at 652; *Butera v. Boucher,* 798 A.2d 340, 348 (R.I.2002); *Kurczy v. St. Joseph Veterans Association, Inc.,* 713 A.2d 766, 770 (R.I.1998); *Cuddy v. Schia-* vonne, 568 A.2d 1387, 1390 (R.I.1990); *see generally Morinville v. Morinville,* 116 R.I. 507, 359 A.2d 48 (1976).

trial, we afford it "great weight." *Sarkisian v. NewPaper, Inc.*, 512 A.2d 831, 835 (R.I.1986). We will not disturb such a ruling by a trial justice "unless he or she overlooked or misconceived material evidence or was otherwise clearly wrong in performing his or her function." *Id.; see also Fox v. Allstate Insurance Co.*, 425 A.2d 903, 907–08 (R.I.1981). In addition, we accord great deference to the trial justice's assessment of the credibility of witnesses. *Donnelly v. Grey Goose Lines, Inc.*, 667 A.2d 792, 794–95 (R.I.1995).

The following language from the jury instructions should also be noted: [13]

"Testamentary capacity means that Blanch Erinakes at the time she executed her will on November 15th, 1994 had sufficient mind to, one, enable her to understand what business she was engaged in, that is, providing for the disposition of her assets upon her death by making a will, and that she possessed sufficient mind to know and recall the natural objects of her bounty and her relationship to them, and that she possessed sufficient mind to know what property she had and the disposition she wanted to make of that property. The testator, in this case Blanch Erinakes, on November 15th, 1994 at the time of the making of her will *must have a full knowledge of the will's content and an understanding of its provisions.*" (Emphasis added.)

There having been no objection to this instruction, it became the law of the case and was binding upon the trial justice when he considered the motion for a new trial. *Sarkisian*, 512 A.2d at 836 ("[J]ury instructions that are not objected to become the law of the case and are binding on both the jury and the trial justice when he or she passes on a motion for new trial."); *Zawatsky v. Cohen*, 463 A.2d 210, 212 (R.I.1983); *see also ADP Marshall, Inc. v. Brown University*, 784 A.2d 309, 315 (R.I.2001).

The trial justice's instruction to the jury on the elements of testamentary capacity (which instruction was not objected to) appears to us to have been overly exigent in requiring that the person making a will must at that time "have a *full knowledge* of the will's content and an understanding of its provisions." (Emphasis added.)

Unlike the instruction that was given in this case, virtually all of this Court's holdings relative to testamentary capacity have not required that there be "full knowledge and understanding of the will's contents." *See, e.g., Rynn v. Rynn*, 55 R.I. 310, 321, 181 A. 289, 294 (1935) ("Eccentricities, peculiarities and oddities in either speech or behavior, or fixed notions and opinions upon family or financial matters will not render a person incapable of making a will, provided such person has sufficient mind and memory to understand the nature of the business he is engaged in when making his will, has a recollection of

---

**13.** Although it is of lesser legal import, the following (largely similar) statement was also made by the trial justice at the beginning of the trial in his "preliminary instructions" to the jury:

"This testamentary capacity has been defined to mean that the decedent must have sufficient mind and memory to understand the nature of the business she is engaged in making her will, that she has recollection of the property she wishes to dispose of by

making her will, that she knows and recalls the natural objects of her bounty and their desserts with reference to their conduct and treatment of her, their necessities and the manner in which she wishes to distribute her property among them, and that as a part of the requirement of testamentary capacity, the maker of a will, that is, the testator, *must have a full knowledge and understanding of the will's contents.*" (Emphasis added.)

the property he wishes to dispose of thereby, knows and recalls the natural objects of his bounty, their deserts with reference to their conduct and treatment of him, their necessities and the manner in which he wishes to distribute his property among them."); *see also Tavernier v. McBurney,* 112 R.I. 159, 162, 308 A.2d 518, 520 (1973) (quoting with approval an instruction that had indicated that one is of sane mind and has testamentary capacity when the person has "a mind sufficient to enable [the] testator to understand what business he is engaged in while he is making a will, also a mind sufficient to enable him to know who the natural objects of his bounty are, his relations to them, what property he has, and the dispositions which he desires to make of it."); *Apollonio v. Kenyon,* 101 R.I. 578, 591, 225 A.2d 778, 785 (1967); *McSoley v. McSoley,* 91 R.I. 61, 78, 161 A.2d 216, 225 (1960). *But see Padykula v. Luoni,* 459 A.2d 965, 967 (R.I.1983) ("[A] will drawn in accordance with the intent of its maker is to be given effect even though the will is written in language not understood by the maker when it is shown that the maker had full knowledge of the will's contents.").

We note that in *Pollard v. Hastings,* 862 A.2d 770, 777 (R.I.2004), a case that we decided after the briefs in this matter were submitted, we quoted at length and with approval the criteria regarding testamentary capacity that are set forth in *Rynn.* We now expressly hold that the wording of the criteria for testamentary capacity that is set forth in *Rynn* is preferable to a formulation that would require the testator to have "full knowledge."

Having reviewed the trial justice's observations and conclusions as he engaged in the "sifting of the evidence" process that is referred to in *Ruggieri,* 114 R.I. at 216, 330 A.2d at 812, we can perceive no basis for overturning his decision not to grant the new trial motion. With a laudable degree of specificity the trial justice reviewed the evidence in light of the controlling law of the case, and we do not find that his "decision was clearly wrong or that [he] overlooked or misconceived material and relevant evidence." *Donnelly,* 667 A.2d at 794.

### Conclusion

We affirm the judgment in the plaintiff's favor. The record may be returned to the Superior Court.