Joseph P. Rynn *et al. vs.* Sarah R. Rynn, *Ex.*

November 1, 1935.

Present: Flynn, C. J., Moss, Capotosto, Baker, and Condon, JJ.

CAPOTOSTO, J. This is a probate appeal involving the admission to probate of the will of Patrick J. Rynn, who died

in Providence, November 9, 1933. The will is dated May 5, 1931. After a long trial in the superior court, the jury returned a verdict sustaining the will. A motion for a new trial was denied by the court, at which time it said: "if an opposite conclusion had been reached, the court would have felt it necessary, without the slightest hesitation, to have granted a new trial." The case is now before this court on appellants' exceptions to rulings at the trial and to the denial of their motion for a new trial.

At the hearing before us, counsel for the appellants relied principally upon the facts and urged that the record clearly showed the legal incompetency of the testator when the will was executed. The subject of undue influence was not pressed and the exceptions taken during the trial were treated as of secondary importance. The transcript of the evidence, which is in three large volumes, has received our careful attention.

The testator was married in 1893. Both husband and wife were industrious people of limited education and means. Three children were born of the marriage, Joseph P., Aloysius R. and Mary F. Rynn, the appellants in this case. The son Joseph lived with the family until 1918, when he married and, after being away for a few years, settled in East Providence. Aloysius remained at home until 1929, when he married Sarah Rynn, the executrix in this case, and moved to a house he built near his parents' property. About 1932 he became estranged from his wife and has remained so ever since. He was childless at the time the will was made, although a daughter was born some time later. Mary never married. She stayed with her father and mother. After her mother's death she remained with her father for a short time and until he left the house to live by himself. In addition to his immediate family, the testator had a niece, Mary Wren, the daughter of a brother, who lived in Connecticut. The mother died March 20, 1931. The testator died of pneumonia at the Hope Hospital, November 9, 1933.

His estate consisted of five parcels of rental property in the city of Providence, with a total assessed valuation of $20,300; a deposit in his own name of less than $100 in the Old Stone Bank, and a joint account in the same bank of a little over $5,000 standing in the name of himself and Sarah Rynn.

By his will, dated May 5, 1931, the testator gave "Five dollars to each of my two sons, Joseph P. Rynn, East Providence, Rhode Island, and Aloysius R. Rynn, of Providence, Rhode Island, and no more of my estate;" he devised to his daughter Mary two parcels of his real estate, which had an assessed valuation of $9,220 or nearly one half the assessed value of all his real estate; a third parcel he left to Sarah Rynn and another to his niece, Mary Wren, of Danbury, Connecticut. After a devise of $100 to his granddaughter, he gave the residue of his estate to Sarah Rynn, whom he also named executrix.

A general review of the numerous and conflicting details given at the trial can be better attempted if we divide the testimony into three periods. The first includes the family life of the Rynns up to the death of the mother on March 20, 1931; the second starts with this date and ends November 9, 1933, when the testator died; and the third extends from this date to the time when an appeal was taken to the superior court from a decree of the probate court of the city of Providence admitting the will to probate.

In the first period, no serious incidents are related by the appellants, who were practically the only persons to testify concerning intimate household matters, until about 1912. From this time on, according to their statements, the family life of the Rynns was an unbroken series of quarrels and disturbances. The father was pictured by them as a man of violence, of morbid and unhealthy thoughts about his wife and children, of unclean habits and of foul speech, who neglected his family to save money and to buy real estate. They all said the same thing about their father in language that was both bitter and unreserved, but they exculpated

themselves, either by direct denial or failure of recollection, from any contributing fault or censurable conduct. The testimony clearly shows that the children acted with diminishing tolerance towards their father as the years rolled by.

Although the appellants admitted that up to about 1918 the testator worked steadily as freight handler, pipe-fitter's helper, night watchman and similar occupations, they said that after that time he spent his time in the house or around the property in idleness and silence, or in groundless accusations and abusive conduct towards the family. The only person he showed any liking for in later years, according to them, was Sarah Rynn, the wife of Aloysius. The testimony shows that Sarah would sit and talk with him from time to time, or bring him an ice cream cone now and then, or take him for a ride, or occasionally do his washing. The appellants further claimed that their father allowed his real estate to fall out of repair and that this fact, joined with his disagreeable attitude towards the tenants, resulted in untenanted property and consequent loss of rents.

A fair consideration of all the evidence, however, does not support in many instances the bitter and extreme accusations that the children made against their father. Those who came in contact with him as friend, employer or neighbor saw little, if anything, wrong with his conduct, dress or speech. A number of apparently disinterested persons testified that he attended church regularly, that he was always occupied in working either around his own property or for others, that he was careful with his money, and that he appreciated any kindness shown him. The inference is strong that the testator was a man who would not tolerate interference by his family in the conduct of his own affairs and who expressed his thoughts in this regard by resorting to behavior and language that was neither restrained nor polite.

The evidence further shows that at times the testator helped his sons materially and they then gladly accepted his

help in spite of what they now say was his constant meanness and uniformly unbalanced mind. Notwithstanding an unfortunate incident in 1913 when Joseph violently quarreled with his father and to which he, Joseph, pointed with pride at the trial, his father, sometime before 1930, made him a gift of $2,000 which Joseph accepted and testified that it was given to him "to sort of compensate me, as he called it, for what he had done for Al."

About 1928, the testator suggested to his son Aloysius, who was commonly called "Al," that he build a house for himself and gave him $1,000 as a gift to buy the land. He thereafter helped him by working at a number of odd jobs and without compensation in the construction of the building. Later he loaned him $2,000 on his unsecured note and without interest to finish the top floor of the house. This note has not been paid.

The daughter Mary has been employed for a number of years. Her earnings in earlier years went entirely to the mother, but later she used them to some considerable extent for her personal needs and pleasure, including a trip to Europe in 1929. Whatever money was turned over by the children to the mother was added to certain rents that Mary collected, and was used for household purposes. The testator never received, and apparently never demanded, any money from his children. Notwithstanding the fact that her father in his will left her almost one half of his real estate in value, Mary was as antagonistic towards him at the trial as were her two brothers.

Whatever property the testator accumulated, represented by real estate, bank deposits and building loan savings, was the result of his own shrewdness and thrift. He disagreed fundamentally with his children as to how he should use his money. He believed in acquiring tangible wealth, while they leaned more towards comfort and transitory things.

The only person of his immediate family who did not speak harshly of the testator at the trial, even though she spoke through the testimony of the children, was the wife and

mother, who died in March of 1931. For some time previous to her death, the children had suggested to her on various occasions that their father be committed to an institution, but each time she refused to consent to any such action. Her conduct deserves serious consideration and must be kept in mind as we consider how the children acted after her decease.

This brings us to the second period that we have above indicated. Almost immediately after the mother's death in March, 1931, the idea of the appellants to commit the testator began to show itself in tangible form. The accomplishment of their common purpose was in charge of Joseph, who, in addition to his business experience, seems to have had some knowledge of the law, which he had acquired at an evening law school. The children state that after the death of their mother the testator became absolutely unbearable and potentially dangerous to Mary's safety. They ascribe the cause solely to his mental condition, but the record discloses a continuing quarrel over the collection of certain rents.

Early in April, 1931, Joseph spoke about his father's condition to Dr. George Coleman, who had attended Mrs. Rynn at various times, including her last illness, and was referred by him to Dr. Jerome McCaffrey. On April 12, within three weeks of his wife's funeral, the testator, while he was in his own home and without previous notice to him, was subjected to the first of three examinations by three different doctors, each acting independently of the others.

In his testimony Dr. McCaffrey stated that the object of his visit of April 12 was to determine whether the testator should be sent to the state hospital for the insane, where Joseph wanted him committed; that he suggested sending him to the Chapin Hospital for observation, but that the son objected, saying that "he knew of some cases which had gone there and had been released following a court hearing," and that the children "wanted affairs arranged so that his *property* could properly be taken care of." (italics ours).

The doctor did not testify to anything occurring at the interview which in his opinion indicated abnormality except that when the son Joseph entered the room the testator "demonstrated very well the state of morbid anger, in which he used some very foul language, ordered his son out of the house and threatened him with bodily harm if he did not go." On being asked if he had any explanation for the fact that the history he received from the family indicated one thing and that the testator's statements indicated another, his answer was: "The psychosis from which I believe he suffered is characterized by lying on the part of the mentally diseased individual, so much so that he is called a pathological liar."

Not satisfied with the advice that his father be sent to the Chapin Hospital for observation, Joseph, at the suggestion of Dr. McCaffrey, went to Dr. William N. Hughes, who, after getting a history from the children, examined the testator on April 15. In describing how the testator reacted and stating the conclusion that he had a permanent psychosis, this doctor, very early in his testimony and before the mention of any will, assumed an advocate's attitude when he volunteered the statement, "I find also at the examination, from a personal examination of Mr. Rynn, without a history, that he was not qualified to make a will, then or at any time in the future, because he was ———" at which point he was stopped by the court.

The third physician to examine the testator at Joseph's solicitation was Dr. John E. Donley, a distinguished psychiatrist of some thirty years practice and with considerable court experience behind him. When asked if he secured a history from the children, his answer was that he "didn't get a history exactly; I had remarks and pieces of information, assertions." He described the method that he used in his three-hour examination in the latter part of April, 1931, and the testator's conduct and language, which showed a virulent antagonism to his children and even his dead wife and a fear of being poisoned by his children; and then

testified that from the facts he had stated he concluded that the testator was a paranoiac, that is a person suffering from false ideas of persecution, and was of unsound mind; that this was a condition that was likely to continue, but that he could not say how this condition would be apt to affect anything he did in which his children were involved. After the examination, on being informed by Joseph at a conference in his office that his father would contest a committal to any institution, the doctor said: "I'm very desirous as I hope you are, of avoiding a public hearing on this sort of thing, because it may develop into a very unpleasant situation. To a long hypothetical question based solely on the appellants' testimony, his answer was: "When I examined this man at that time, that is in April, the evening that I examined him, he was of unsound mind. Whether he continued to be of unsound mind after that I do not know, except in so far as the hypothetical question sets forth his acts and his words. And taking the hypothetical question as expressing what happened to this man after I saw him, and assuming as true what is stated therein, my belief is that on May 5th Mr. Rynn was of unsound mind." When he was asked on direct examination if it would be possible for Mr. Rynn to have a "lucid interval" on May 5, 1931, he first interpreted the question for himself and then proceeded to answer it by saying: "If by 'lucid interval' we are going to mean a return to a state of soundness of mind from a state of unsoundness of mind in a man who had paranoia, or paranoid ideas, then I should say no."

When the testator realized what the children were doing, he immediately consulted his attorney and sought medical advice for his own protection. He first went to the well known surgeon, Dr. Joseph C. O'Connell, who had treated him on several occasions a number of years before, and told him of his predicament. The result of this interview was that the doctor, notwithstanding his expressed opinion that as far as he could see Mr. Rynn was "all right mentally," told him that as he "was not a specialist in that

line" Mr. Rynn should consult a psychiatrist and advised him to see Dr. Charles A. McDonald. This the testator did within a few days thereafter.

Dr. McDonald, a psychiatrist of recognized ability and standing, testified that, in the latter part of April, the testator came to his office alone and, after stating that he had been examined by doctors sent to him by his children and that he had consulted his attorney with reference to such conduct, gave him a history of his domestic life and troubles over money matters and said that he was there to be examined as he was about to make a will. The doctor then made a careful examination of the testator. While the doctors for the appellants had examined the testator with a view of committing him to some institution for the insane, as the children hoped to do, Dr. McDonald's attention not only was directed to his general mental condition but was specially concentrated on the soundness of his mind with reference to the making of a will.

In answer to a hypothetical question based upon his examination and other testimony for the appellee, Dr. McDonald expressed the opinion that the testator was of sound mind on May 5, 1931. The assumed facts that were presented to him, in cross-examination and in the form of the hypothetical question that had been asked each doctor for the appellants, did not change his opinion. To an inquiry by the court, he answered that, in his opinion, the testator on May 5, 1931, had sufficient mental capacity to understand and appreciate the nature and extent of his property and his relationship to those about him, that he knew the task at hand, and that "his beliefs regarding his children," as assumed in the hypothetical question of the appellants, "had nothing whatsoever to do with his act that day."

Dr. George Coleman, who had been at the testator's home at different times over a number of years to attend Mrs. Rynn and who was first consulted by Joseph soon after her death in regard to his father's mental condition, did not testify.

On the evening of April 27, 1931, the testator went to the home of his attorney, James M. Gillrain, a reputable member of the bar of some thirty-eight years practice, and told him that he was going to call at the office to fix his property. He kept his promise on May 5, 1931, when he made the present will. In talking over the details with his attorney before the preparation of the will, the testator said that he was going to give his sons Joseph and Aloysius "five dollars and no more" because they had not acted in a dutiful way towards him and had treated him cruelly. He left the completed will with his attorney for safekeeping and said nothing about it to any one.

Shortly before his death, November 9, 1933, the testator left his daughter and went to live by himself in a tenement in one of his houses. Joseph stated that he and Aloysius came to him the Sunday after he left to see "if we could straighten things out again, we got in and things got hot right away. I tried to coax him back to the house, he wouldn't talk to us, he raved and said how he was crucified." Unsuccessful in his mission, Joseph went back to his sister's house and, for some unexplained reason, made a memorandum of the incident, which he used at the trial, containing this alleged statement by the father: "What do you dirty . . . want in here? So you will have me in Howard in a week . . ." A few days later the father died of pneumonia at the Hope Hospital.

The third period furnishes the climax to the tragic history of this family and the reason for the proceedings that have now reached this court. Unaware of the existence of any will, a petition for administration was presented to the Probate Court of the city of Providence in which Aloysius, the petitioner, prayed that Joseph be appointed administrator of his father's estate. The petition was assented to by Mary and all requirements of notice were waived. When the will was produced, surprise and disappointment led to this contest and to the presentation by Aloysius of a claim for rent covering the time that his father and his sister lived in

the house he built a few years before with the father's assistance.

The claim of undue influence, which was one of the grounds set forth in the reasons of appeal from the decree of the Probate Court admitting the will to probate, was not pressed in this court either in the brief or in the oral argument for the appellants and, therefore, is deemed to be waived.

The real and sole issue is the testamentary capacity of Patrick J. Rynn on May 5, 1931. The appellants attempted to prove that he had always been of unsound mind and that, therefore, he was at all times incapable of making a will. The appellee, on the other hand, contended that the testator was a sane, shrewd, conservative man, who was disappointed with his children and distressed by the conduct of his two sons in particular.

The appellants pictured the testator as an insane person, at least in so far as his immediate family was concerned, who should have been committed to an institution many years before, and consequently urged that he did not have testamentary capacity on May 5, 1931.

Eccentricities, peculiarities and oddities in either speech or behavior, or fixed notions and opinions upon family or financial matters will not render a person incapable of making a will, provided such person has sufficient mind and memory to understand the nature of the business he is engaged in when making his will, has a recollection of the property he wishes to dispose of thereby, knows and recalls the natural objects of his bounty, their deserts with reference to their conduct and treatment of him, their necessities and the manner in which he wishes to distribute his property among them. *American Bible Soc.* v. *Price,* 115 Ill. 623; *Hanrahan* v. *O'Toole,* 139 Ia. 229; *Yetter* v. *Yetter,* 185 Ind. 206. The appellants contend that the testator was of unsound mind as to his relations to his children and the nature of their claims to his bounty; and that at the time he made his will he entertained certain delusions concerning

them. The fact that a testator has delusions with reference to any particular person or thing at the time he makes a will is not sufficient of itself to invalidate his act.

An insane delusion does not deprive a testator of the capacity to make a will, if the delusion does not affect the memory and understanding of the person who suffers therefrom as to the nature and extent of his estate, the proper objects of his bounty and the nature of the testamentary act. To have such an effect it must be found that the delusions substantially affected the will and that one or more of its provisions were the product thereof. *Page on Wills,* (2nd ed.) Vol. 1, p. 166; *Rivard* v. *Rivard,* 109 Mich. 98; *In re Rockett's Estate,* 191 Mich. 499.

We have carefully reviewed the testimony in this case because the appellants, in both brief and argument, stress the fact that this is an unusual case. We agree in this with counsel for the appellants, but we cannot accept their premises or follow them in their conclusions.

When appellants' counsel state that there is almost no contradiction on the material facts, they assume that full credence will be given to the testimony of the appellants and that no adverse conclusion can or will be drawn against them. Facts and inferences which, considered singly, seem to establish one thing, often lead to a different and opposite conclusion when weighed in combination and in the light of all the surrounding circumstances. The testimony of the appellants, given with such forwardness, as appears even in cold type, shows a prejudice and selfishness that creates an unfavorable impression. The silence of their mother, who for decades lived under conditions which they depicted as unbearable, and their decision immediately after her death to commit their father to an institution for the insane, from which he could not easily be released, "so that his property could be properly taken care of," tend to impeach the sincerity of appellants' assertions. That decision and the reason they gave for it indicate a selfish motive for their conduct, which was such as might

well cause a sane man to look with disfavor upon two sons who thought more of protecting property than of the comfort and peace of mind of their own father. There was, therefore, a sharp contradiction as to material facts when all the testimony, together with such inferences as may be reasonably drawn therefrom, is considered as a whole.

After a long trial, the jury sustained the will. The trial court approved its verdict in positive and unmistakable language. A careful study of the record has not brought us to the conclusion that the court erred in denying the appellants' motion for a new trial. Their exception to this action of the court is overruled.

Exceptions 2, 3, 4, 6, 13, 14, 15, 16, 17, 24, 25, 26, 27 and 28 to the rulings of the court are incorporated in the appellants' brief, and some of these were argued at the hearing in this court. All other exceptions in the appellants' bill of exceptions not briefed or argued are deemed waived. We are not concerned with exceptions that involve no real prejudice to the appellants or that have lost their force by the later admission of evidence from the same witness to substantially the same effect. Under this head fall exceptions 2, 6, 13 and 14.

The third exception relates to the exclusion of a question to a lay witness, a Mrs. Hirst, who, after having testified to certain facts, was asked to express her opinion as to the testator's mental condition based upon her "observations of his actions and his language" during the period that she knew him, without limiting her to the facts to which she had testified. A lay witness may express an opinion as to a testator's mental condition only when such opinion is based solely on facts within the knowledge of the witness and as to which such witness has previously testified. *DiOrio* v. *Cenci*, 54 R. I. 441; *Hopkins* v. *Wheeler*, 21 R. I. 533. The question, as framed, was objectionable and properly excluded.

The fourth exception has reference to a question directed to the son Aloysius. This witness testified that, after his

marriage in 1929, he told his wife, Sarah, who is the proponent of the will, the details of the suffering that his mother and the children had endured at the hands of the testator. He was permitted, without objection, to state that her answer was: "He must be crazy; I wouldn't live with a man like that." He testified that she said that more than once. Shortly thereafter he was asked the following question: "And up to the time your father made his will, on May 5, 1931, how many times did your wife say that in her opinion your father must be crazy?" The objection to this question was sustained. In pressing their exception to this action of the court, the appellants urge that the question was proper inasmuch as it was directed to an admission by a party in interest. We disagree with the appellants.

While the admissions of a party to the record are admissible as substantive evidence, even though the declarant may be acting in a representative capacity, yet this rule has no application where, as in the present case, the testimony offered was not that the party had previously stated a fact or made a contention, which was inconsistent with her present claim, but only that she had stated, in substance, that if the testator had acted as the witness had told her, "he must be crazy," a mere opinion based on alleged facts outside of her own knowledge. Moreover, the question excluded concerned only the number of times the statement, previously in evidence, was repeated. The authorities cited on the appellants' brief do not support the exception and we find that the exclusion of the question did not constitute error prejudicial to them.

The fifteenth exception brings in issue the correctness of the following question addressed in direct examination to a medical witness for the appellants: "Was the mental condition of Patrick J. Rynn on May 5, 1931, such that he possessed free will and sufficient understanding to comprehend the nature and effect of his act when he signed the instrument of that date purporting to be his will, under the provisions of which there was disposition of his property?"

This question as stated was improper because it asked the witness to invade the exclusive province of the jury. When a proper basis has been laid, it is competent for an expert to give his opinion of the soundness or unsoundness of mind of a testator at any particular time, or to state whether he then had a mind sufficiently clear and strong to understand and retain the special elements the comprehension of which is required by law for the making of a valid will, but neither lay nor expert witness can give his conclusion as to whether the testator "possessed free will" at the critical time under inquiry. That is the issue of "undue influence" and is for the jury alone to decide, if it is raised by the evidence. The question was also improper because it did not give the basis for the opinion asked for.

The question, the exclusion of which is the subject of the seventeenth exception, was likewise improper because it asked the same witness to invade the province of the jury alone, as to the effect of alleged insane delusions upon the will. The sixteenth exception is without merit, for the trial justice was clearly justified in cautioning the same witness not to express an opinion as to whether the testator "possessed the requisite mental capacity to execute a will." That was a conclusion which only the jury could draw under instructions from the court as to what would constitute such "requisite mental capacity."

Exceptions 24, 25, 27 and 28 are directed to explanatory remarks made by the court in connection with certain requests to charge asked for by the appellants and granted. Requests to charge that are argumentative or unduly stress some feature of the case, are subject to reasonable and impartial comment by the court, even though they correctly state legal principles. If a court refrains from any expression of its own views in the matter, it may properly call the attention of the jury to such testimony as it believes should be considered by them in applying the legal principles contained in the charge. *State* v. *Grills*, 35 R. I. 70. *Faccenda* v. *R. I. Co.*, 43 R. I. 199. We have carefully considered

the remarks of the court about which complaint is made, and find them not only proper but reasonably necessary. These exceptions are without merit.

The 26th exception is to a modification by the court of the following request to charge: "If you find that Patrick J. Rynn was totally insane for some time prior to May 5, 1931, or if you find that he was partially insane for some time prior to May 5, 1931, the proponent must prove by a fair preponderance of the evidence that on May 5, 1931, he *had recovered from his total or partial insanity*, and if the proponent has failed to sustain this burden, you must find that the appellee's exhibit 1 is not the last will and testament of Patrick J. Rynn." (italics ours). This request as given by the court reads that "the proponent must prove by a fair preponderance of the evidence that on May 5, 1931, he *possessed testamentary capacity as previously explained to you in my charge.*" (italics ours). The issue was not the testator's restoration of mind from "total or partial insanity" on May 5, 1931, but whether on that day he had a mind sufficiently sound to dispose of his property by will. Testamentary capacity is the proper test to apply, and this is what the court instructed the jury to apply.

All the appellants' exceptions are overruled and the case is remitted to the superior court for further proceedings.

*Comstock & Canning, Edward M. Brennan, Andrew P. Quinn*, for appellants.

*James M. Gillrain, John M. Clifford*, for appellee.