Raymond F. **POLLARD**

v.

Eugene **HASTINGS** et al.

**No. 2003–169–Appeal.**

Supreme Court of Rhode Island.

Dec. 16, 2004.

Kenneth A. Tremblay, Portsmouth, for Plaintiff.

Kenneth Glenn Littman, Falls River, MA, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

GOLDBERG, Justice.

This case came before the Supreme Court on November 3, 2004, on appeal from a Superior Court order granting a new trial to the defendants, Eugene Hastings (Eugene) and Phyllis Hastings (Phyllis or, collectively, defendants), co-executors and sole heirs of the estate of James Pollard (James or decedent), late of Tiverton, Rhode Island. The plaintiff, Raymond F. Pollard (Raymond or plaintiff), the decedent's brother, contested the will and seeks reinstatement of the jury finding that the decedent lacked testamentary capacity to execute a will. For the reasons set forth herein, we deny and dismiss the

appeal and affirm the order of the Superior Court.

## Facts and Travel

From the time of his marriage in 1966 until September 1998, James resided in his own home, receiving assistance in his later years with his personal affairs from his neighbor, Normand Pratt (Pratt).[1] One day, when going to pick up James to go grocery shopping, Pratt noticed that James "looked disheveled and had slurred speech." Pratt brought James to Charlton Memorial Hospital in Fall River, Massachusetts, where it was determined that he had suffered a stroke. From the hospital James was sent to a rehabilitation center and later to stay with his brother, Raymond. In March 1999, James went to the Catholic Memorial Home (nursing home), where he lived for the rest of his life.

James passed away on December 13, 2000, at the age of ninety, survived by his brother, Raymond, and several nieces and nephews. On August 12, 1999, James had executed a will leaving his entire estate to his nephew, Eugene, and Eugene's wife, Phyllis. Eugene and Phyllis, the nominated co-executors, filed a petition in the Probate Court of the Town of Tiverton for allowance of the will. The attorney for the estate duly notified James's heirs at law of the pending petition. Raymond appeared and objected to the allowance of the will. At the probate court hearing, the court found that James had the requisite testamentary capacity and had not been unduly influenced in executing the will. The plaintiff filed an appeal with the Superior Court alleging that James lacked testamentary capacity and that the will was the product of the undue influence of Eugene and others.

A jury trial commenced in December 2002. The defendants presented the testimony of two legal secretaries, Susan Klapthar (Klapthar) and Debra Godino (Godino), who witnessed the execution of James's will. Both witnesses testified that they met James a few times when he came to the office to discuss and sign his will. Their encounters with James were brief, but each testified that he was able to converse with them and that he observed and commented on the fact that Klapthar was left handed. Both Klapthar and Godino witnessed the will and signed affidavits stating that James appeared to be of sound mind and testamentary capacity.

The decedent's physician, Warren Wood, M.D. (Dr. Wood), who treated James from 1989 until his death in 2000, testified on behalf of defendants. Doctor Wood described three visits he made to James at his nursing home in May, July, and September 1999. During those examinations, Dr. Wood observed James to be "alert" and his mental state to be "appropriate." In June 1999, Dr. Wood ordered a psychiatric evaluation of James. The nursing home psychiatrist, Jeffrey Sutton, M.D. (Dr. Sutton), diagnosed James with a mood disorder but, nevertheless, concluded that James was competent. The psychiatrist conducted a subsequent evaluation in October 1999 and did not remark on any change in James's mental status.

Doctor Wood also testified that caretakers at the nursing home administered a mini-mental status exam, on which James scored a twenty-nine out of thirty, an "excellent" result. When asked his opinion of James's competency as of August 1999, Dr. Wood said: "I saw nothing to be suspicious. He seemed very appropriate." Doctor Wood also characterized James as "a tough individual" who was "very determined," "very stubborn," and wanted things his way. Doctor Wood admitted

---

1. James's wife died in 1978; after her death James lived alone in their Tiverton home.

that it could be difficult to communicate with James, given his hearing deficit, but went on to say that "I believe with a little yelling and him reading lips I was able to communicate."

On cross-examination, plaintiff presented Dr. Wood with documents that nursing home employees prepared around the time James executed the will that described his cognitive status as "deteriorated" and described him as "confused daily." Doctor Wood testified that the documents did not change his opinion of James's mental state, explaining that the forms nursing home employees use are very subjective. Doctor Wood suggested that he would have to question the workers to understand their assessments.

Josephine Alfonso (Alfonso), the director of social services at the Catholic Memorial Home during James's residency at the home, recounted her observations of James. She described James as "very feisty" and "[a]rgumentative" when she first met him, saying that he complained about his room at the nursing home. Alfonso went on to say that she empathized with James because when he was brought to the nursing home the only room that was available to him was the size of a closet. From James's admission to the nursing home through August 1999, Alfonso was able to assess him almost every day. Alfonso specifically recalled that James "looked well" on August 12, 1999, the day he executed his will. She said that, in August 1999, "[James] was probably at his best at that time. You know, he was pleasant. He looked well [and was able to communicate with me]."

The plaintiff cross-examined Alfonso about assessment forms completed at the nursing home. Alfonso explained that on June 10, 1999, and September 2, 1999, she checked off the boxes on the form for impaired judgment and decision-making because she believed his hearing deficiency affected his ability to understand his medical condition and to make medical decisions. On the form Alfonso filled out in September 1999, she noted that James had been wandering and acting in an inappropriate manner. Alfonso explained that, although he did very well through the summer, James then began a slow decline and that it was her duty to document such observations.

Thomas T. Brady, Esquire (Brady), the attorney who drafted the will, testified about his meetings with James between April and August 1999. Brady described his initial meeting with James, in which they discussed executing a power of attorney authorizing Eugene and Pratt to tend to his business affairs. Brady observed that: "[James] knew about his affairs. He knew about his mutual funds. He knew he had bank accounts. He knew he had bills to take care of. And he knew about his home in Tiverton." According to Brady, the decedent appeared cognizant of his holdings and his estate.

In May, when James returned to Brady's office to sign the power of attorney, they discussed the making of a will. Brady explained that Eugene and Pratt would bring James to his office, but that whenever the topic of James's will arose, he would ask to speak with James alone. James informed Brady that he was a widower and did not have any children, naming his brother and his nieces and nephews as his next of kin. Brady testified that his impression from the conversation was that James was not close with most of his relatives, except for Eugene and a niece, Marilyn Souza. Brady explained that James "wasn't a man to go into a lot of detail, but that it was pretty clear right from the outset that he wanted to leave his property to Eugene and Eugene's wife Phyllis." James also expressed his desire to leave

his house to the Pollard family for generations to come. Brady voiced concern to James about this request and explained to him that money would have to be placed in trust to maintain the home if the house sat vacant.

Brady also recalled that James did not speak favorably about his brother, Raymond, and called him a "miser." When asked about James's mental state at the May meeting, Brady said: "To me he was alert. You had to speak somewhat loudly to him. But all indications to me I could carry on a conversation with him. He could answer questions, and I could certainly understand what he wanted to do."

When Brady met with James in July 1999, they again discussed the house in Tiverton, and James decided simply to leave all his property to Eugene and Phyllis. Brady then drafted a will for James. When James returned to Brady's office to execute the will, Brady reviewed its contents with James, paraphrasing each provision. James confirmed that the will was as he wished it to be. James and the two witnesses, Klapthar and Godino, then signed the will in each other's presence. Brady testified that "[James] was certainly mentally competent. Understood what he was doing. Understood the nature of his property. Understood the nature of the disposition of his property and understood those things completely."

Pratt, James's neighbor of thirty-five years, testified that he began assisting James with his personal errands in 1989. Pratt explained that for many years he saw James two to three times per week and later, when James resided in a nursing home, visited him nearly every day. While in the nursing home, James asked Pratt to contact Eugene. Pratt drove James and Eugene from the nursing home to James's house in Tiverton to survey some water damage, which led to Brady's drafting the power of attorney. Thereafter, Eugene traveled from his home in Arlington, Massachusetts, to Tiverton every week to ten days to attend to James's affairs in conjunction with Pratt.

Pratt testified that James's mental state remained unchanged from January through August 1999. Pratt said that James "could be a hard guy to get along with * * * and he was set in his ways." He recalled James having days on which his medication "didn't agree with him or he didn't want to take it," saying that "some days [James] was riled up."

The last witness for the defendants was Eugene. Eugene testified that he had maintained a "very good" relationship with his uncle, James, even serving as his best man when James got married in 1966. Eugene said that he visited his uncle often, but had no knowledge of the contents of the will until after James's death.

Sonia Gunner (Gunner), an attorney, testified for plaintiff, and stated that she was contacted by Raymond, on behalf of James, in October 1998 about revoking a power of attorney the decedent previously had granted to his niece. Once Gunner prepared the document, she visited James at the nursing home and he executed the revocation. Gunner testified that she again was contacted by Raymond to arrange a visit with James to discuss making a will. On January 16, 1999, Gunner met with James at Raymond's house, where he was staying at the time. James reviewed his assets with Gunner, mentioning his desire to keep the Tiverton home in the family. When the topic turned to family and she asked him about his wife's family he said they were "parsimonious" and then became "extraordinarily agitated." Gunner explained that she had difficulty getting James to focus on the disposition of his assets, and decided to end the meeting.

Gunner met with James in February 1999 and twice in March 1999, but she was unable to derive sufficient information from him to draft a will. Gunner testified that she had concerns about James's competency, based on "his inability to focus on the questions I was asking[, e]specially that first meeting when we discussed the will * * * and he just became so agitated that we couldn't continue."

The plaintiff called Daniel Harrop, M.D. (Dr. Harrop), to testify about James's competency to make a will. The defendants had moved *in limine* to exclude Dr. Harrop's testimony because he had not examined James and his opinion was based solely on records made by others. The trial justice denied the motion, noting "I might sit here and question what weight might be assigned by a fact finder to that opinion, [but] I don't believe I can exclude it completely and not allow him the opportunity to offer, for better or worse, his opinion."

Doctor Harrop testified that he reviewed visiting nurse records prepared while James was staying with his brother; nursing home records from March 1999 through September 2000; Dr. Sutton's evaluations; and records from a psychiatric consultation by Larry Strasberger, M.D. Doctor Harrop referred to nursing home reports that noted confusion, communication problems, memory issues, and instances of violent behavior. He also noted a report in February 1999 of "two episodes of increased agitation and confusion lasting one to twelve hours." Doctor Harrop indicated that he had not spoken to any of the visiting nurses or to James's attending physician, Dr. Wood.

Based solely on his review of the decedent's medical records, Dr. Harrop concluded that "[James] waxed and waned as far as his mental status during that time." Doctor Harrop testified that his opinion was supported by the various records he reviewed, and concluded that James was not competent to execute a will in August 1999. Doctor Harrop based his opinion as follows:

"I base that opinion on the medical records that I have reviewed * * * as well as my training and experience in treating geriatric patients. And in particular, in his records, the nursing notes of August 1999, the summary where he was reported to be confused daily as well as the social service evaluation of early September 1999[ ] that indicates the same type of confusion, behavioral discontrol and paranoia."

On cross-examination, defendants asked Dr. Harrop whether it would have assisted him in formulating his opinion to know that Alfonso considered August 1999 to be one of the best months James had at the nursing home. Doctor Harrop responded "I would have to take it into account. It would have been a three-year old memory as opposed to a contemporaneous on the spot report." Doctor Harrop admitted that it may have been helpful if Alfonso had explained what she meant when she indicated that James was confused on the assessment forms.

The defendants questioned Dr. Harrop about several of the assessments and evaluations that cast a favorable light on James's competency. He explained that when he was writing his opinion of James's competency, he "was picking out episodes where [James] was confused and agitated and appeared incompetent in the records" and not other times when he appeared competent, although he acknowledged that there were occasions, as reflected in the records, that James was competent.

The last witness to testify was Raymond. He recounted incidents that occurred when James was living with him and became upset because he thought peo-

ple were looking in the windows at them. Raymond explained that he attempted to calm James by reminding him that the house sits back from the street and the windows are seven feet above the ground, but James was not persuaded. A few months later, Raymond testified, he was awakened at five o'clock in the morning by the sound of James's walker in the bedroom. Raymond said that James wanted help shaving because he had a doctor's appointment. When Raymond explained that he would have to wait until the health aide arrived at nine o'clock, James became angry, raising his walker and threatening Raymond.

The trial justice instructed the jury to determine, based on the evidence, whether James had the requisite mental capacity to execute a will,[2] to wit, "that the decedent when he made the will had a mind sufficient to understand the nature of the property that he was leaving, to whom he was leaving it, and that he intended to do the same." He went on to explain that "[t]he defendants, the proponents of the will, have the burden of proof with respect to legal capacity. That burden is by clear and convincing evidence." There were no objections to the charge to the jury.[3]

The jury found that Eugene and Phyllis, the proponents of the will, had failed to meet their burden of proving that James was legally competent to make a will, and returned a verdict for plaintiff. Thereafter, defendants moved for a new trial, pursuant to Rule 59 of the Superior Court Rules of Civil Procedure. On January 10, 2003, the trial justice granted the motion, noting "in the course of some fourteen plus years I have not once granted a Rule 59 motion because, as any judge would be, a judge is reluctant obviously to interfere with the prerogatives of the jury."

The trial justice explained "in this particular case I was stunned by the verdict that was returned." He noted that defendants "correctly recited a long line of witnesses who testified as to the decedent's capacity and witnesses who were able to observe the decedent at a time either when he was executing the will or proximate to it" and that the testimony "clearly and convincingly supported a conclusion of capacity." The trial justice commented on plaintiff's evidence, finding it "flawed."

> "As related to [Raymond], the anecdotal observations were not proximate in time. And moreover, such fantasies, whatever the decedent may have had, if I am [to] believe it to be true, [which] I will for the purpose of deciding this motion, did not in any way detract from the other testimony that relates to capacity at the time that he executed the will.
>
> " * * *
>
> "Turning to Dr. Harrop's testimony, to be truthful, I thought long and hard before I even allowed that testimony to go in because * * * I believe the weight to be assigned to it could be assigned to it by a fact finder. But Dr. Harrop, one, never examined the decedent. Secondly, it was clear * * * that he selectively chose what he chose to support a conclusion of incapacity versus capacity. Is there evidence here that would support

---

**2.** At the close of evidence, defendants moved, pursuant to Rule 50 of the Superior Court Rules of Civil Procedure, for judgment as a matter of law on the issue of undue influence. The trial justice granted the motion, ruling that "there is no evidence that would support an inference of undue influence no matter how favorably I would view that record from the point of view of the plaintiff." This ruling is not before this Court on appeal and, therefore, we have omitted the facts and law pertaining to this issue.

**3.** The burden of proof in a will contest is a preponderance of the evidence. *See infra*, note 4.

incapacity? Yes. Do I believe it, no. I think the evidence is overwhelmingly the other way."

The trial justice granted the motion for a new trial, and plaintiff filed a timely appeal from the order of the Superior Court.[4] Before this Court, plaintiff argues that in granting defendants' motion for a new trial, the trial justice overlooked or misconceived material evidence. The plaintiff asserts that there was competent evidence before the court to support the jury's verdict and, therefore, the trial justice's order granting defendants' motion for a new trial must be reversed.

## Standard of Review

■ A trial justice's role in considering a motion for a new trial is that of a superjuror, who must weigh the evidence and assess the credibility of the witnesses. *Oliveira v. Jacobson*, 846 A.2d 822, 826 (R.I.2004) (citing *Hefner v. Distel*, 813 A.2d 66, 69 (R.I.2003)). "If, in his or her independent judgment, the evidence is balanced and reasonable minds could differ on the outcome, the trial justice must approve the verdict." *Id.* (citing *Skene v. Beland*, 824 A.2d 489, 493 (R.I.2003)). However, if credible evidence does not support the verdict, then the trial justice should order a new trial. *Id.* (citing *Skene*, 824 A.2d at 493). On appeal, this Court will not disturb a trial justice's decision on a motion for a new trial provided that he or she "conducts the appropriate analysis, does not overlook or misconceive material evidence, and is not otherwise clearly wrong." *Morrocco v. Piccardi*, 674 A.2d 380, 382 (R.I.1996) (citing *Interna-*

*tional Depository, Inc. v. State*, 603 A.2d 1119, 1123 (R.I.1992)).

## Discussion

■ The plaintiff argues that the trial justice did not conduct a thorough analysis of the evidence and, thereby, failed to do justice between the parties. The defendants counter that the trial justice properly considered all the evidence in reaching his decision. Our review of the record reveals that the trial justice performed an appropriate analysis; he reviewed the testimony and documentary proof, weighed the evidence, commented on the credibility of the witnesses, and found that he did not agree with the verdict.

■ It is well-settled that in a will contest, the proponent of the will bears the burden of proof of testamentary capacity by a fair preponderance of the evidence. *Nelson v. Blake*, 173 A. 625, 626 (R.I.1934). The test for testamentary capacity is equally well-settled; all that is required is that, at the time of execution of the will, the testator:

"[1] has sufficient mind and memory to understand the nature of the business he is engaged in when making his will[; 2] has a recollection of the property he wishes to dispose of thereby[; 3] knows and recalls the natural objects of his bounty, their deserts with reference to their conduct and treatment of him, [and] their necessities[;] and [4] the manner in which he wishes to distribute his property among them." *Rynn v. Rynn*, 55 R.I. 310, 321, 181 A. 289, 294 (1935).

---

4. On February 10, 2003, the trial justice met with the parties to acknowledge an error of law that he had made. He explained that he had instructed the jury on an incorrect burden of proof and that the appropriate burden of proof in a will contest is proof by a fair

preponderance of the evidence, rather than clear and convincing evidence. The trial justice confirmed that he would have granted the motion for a new trial under a fair preponderance analysis.

"Eccentricities, peculiarities and oddities in either speech or behavior, or fixed notions and opinions upon family or financial matters will not render a person incapable of making a will * * *." *Id.*

The trial justice was "stunned" by the jury's verdict, indicating that, in his independent judgment, there was insufficient evidence to support it. In performing his review as a superjuror, the trial justice evaluated all the evidence and assigned greater weight to the testimony of the defendants' witnesses, who observed James proximate in time to when he executed the will, than to plaintiff's witnesses, who did not testify from personal knowledge. Although he acknowledged the existence of evidence tending to show James lacked capacity, the trial justice's determination was that the evidence "overwhelmingly" tipped in favor of defendants.

The plaintiff introduced evidence that James was prone to outbursts and told "stories," suggesting that he was not of sound mind. In *Rynn*, this Court affirmed the denial of a motion for a new trial in a will contest. *Rynn*, 55 R.I. at 323, 181 A. at 295. The decedent left the bulk of his estate to his daughter-in-law. *Id.* at 313, 181 A. at 290. The will contestants, children of the decedent, argued that the testator was insane. *Id.* at 316, 181 A. at 292–94. Testimony adduced at trial revealed that the decedent had fundamental disagreements with his children punctuated by outbursts of foul language, threats, and fear of being poisoned. *Id.* at 315–17, 181 A. at 292–93. A jury sustained the decedent's will and this Court declared "[t]he fact that a testator has delusions with reference to any particular person or thing at the time he makes a will is not sufficient of itself to invalidate his act." *Id.* at 322, 181 A. at 294.

■ In this case, there was no evidence that James was entertaining any sort of delusions proximate in time to the execution of his will. Furthermore, delusive behavior alone does not deprive one of testamentary capacity. "To have such an effect it must be found that the delusions substantially affected the will and that one or more of its provisions were the product thereof." *Rynn*, 55 R.I. at 322, 181 A. at 294. The plaintiff does not relate James's behavior to the making of his will or to any particular provision in the will. The plaintiff further asserts that James's hearing deficiency had an impact on his capacity to execute a will. Doctor Wood, Alfonso, and Brady, each of whom had occasion to interact with James at least a few times between April and August 1999, all indicated that they were able to communicate with him, albeit with a little effort, such as speaking loudly and having him read lips.

We are satisfied that the trial justice conducted the appropriate analysis and did not overlook or misconceive any material evidence, and did not otherwise err in ordering a new trial.

### Conclusion

For the foregoing reasons, we affirm the order of the Superior Court. The papers of the case are remanded to the Superior Court.