DECISION
Before this Court for decision is an action to set aside the Ernest J. Romano Revocable Living Trust dated January 8, 2003 ("Trust"). In his complaint, Plaintiff Michael A. Romano ("Plaintiff") alleges that the decedent, Ernest J. Romano, ("Decedent") lacked the requisite mental capacity to execute the Trust. Plaintiff further claims that the Trust should be invalidated because it was the result of undue influence exerted on Decedent by Thomas A. Reopell, John P. Reopell and William J. Reopell (collectively the "Defendants"). Throughout this decision, for the sake of convenience, Defendants will be individually referred to by their first names. This matter is before this Court for decision following a non-jury trial.[1] Jurisdiction is pursuant G.L. 1956 §8-2-13.[2]
 Facts and Travel
Decedent passed away, at the age of ninety-eight, on January 14, 2004. He was predeceased by his wife, Freeda, and was not survived by any children. The estate planning documents, the validity of which Plaintiff contests, were executed on January 8, 2003. The main document at issue is the aforementioned Trust. The Trust is accompanied by the Last Will of Ernest Romano, which provides that all remaining assets at the time of death be placed into the Trust. The provisions of the Trust, relevant to this action, are as follows: (1) a specific distribution of Decedent's residence, valued at $275,000, and personal property to Thomas; (2) a discharge and forgiveness of a mortgage balance owed to Decedent by William, for certain property located on Kilvert Street in Warwick; (3) a specific cash distribution of $25,000 to Plaintiff and (4) the residuary balance of the estate, approximately $300,000, to be divided equally between John and William. Decedent served as the trustee during his life and thereafter the named successor trustee, Thomas, assumed the position. John was designated as the alternate successor trustee. Plaintiff is Decedent's nephew, related by blood. Thomas and John are Decedent's nephews and William is Decedent's great-nephew, related by marriage. The Trust and accompanying last will were prepared by Attorney James G. Couch ("Couch").
Plaintiff would have this Court determine that the Trust is null and void and therefore of no further effect in the probate of Decedent's estate. Such a finding would render the last will, which accompanied the Trust, also void of any purpose. Plaintiff has petitioned the Warwick Probate Court to instead probate the Last Will and Testament of Ernest Romano, dated August 17, 1993 (the "1993 Will"). Similarly to the Trust, the 1993 Will devised the Decedent's residence and personal property to Thomas. The 1993 Will also forgave William the balance of the mortgage owed on the Kilvert Street property. The residuary of Decedent's estate was, however, distributed differently, with the entire balance having been devised to Plaintiff. This document was drawn up by attorney A. Earl Shaw Jr. ("Shaw"). Shaw was the named executor of the 1993 Will, and Plaintiff was the alternate executor.
 Standard of Review
Rule 52(a) of the Rhode Island Superior Court Rules of Civil Procedure provides that "in all actions tried upon the facts without a jury . . . the court shall find the facts specially and state separately its conclusions of law thereon." R.I. Super. R. Civ. P. 52(a). Our Supreme Court has stated that "[t]he trial justice need not engage in extensive analysis to comply with this requirement." White v. Le Clerc, 468 A.2d 289, 290 (R.I. 1983). Therefore, "even brief findings will suffice as long as they address and resolve the controlling factual and legal issues."Id. In instances of non-jury trials, "[i]t is axiomatic that a trial justice is in the best position to assess the credibility of witnesses and weigh the evidence." Dellagrotta et al. v.Dellagrotta, 873 A.2d 101, 114 (R.I. 2005). In addition, "[i]t is also the province of the trial justice as a part of the fact-finding process to draw inferences from the testimony of witnesses, and such inferences, if reasonable, are entitled on review to the same weight as his [or her] other factual determinations." Walton v. Baird, 433 A.2d 963, 964 (R.I. 1981); see also Rhode Island Hospital Trust National Bank v.Israel, 119 R.I. 298, 306, 377 A.2d 341, 345 (1977). Hence, "[d]etermining what constitutes a just or unjust result requires a trial justice to examine the facts of the particular case and balance the equities." Dellagrotta et al. v. Dellagrotta,873 A.2d at 115. Furthermore, "[i]t is within the trial justice's discretion to determine the appropriateness of, and to formulate, equitable relief." Ruggieri v. East Providence, 593 A.2d 55, 57
(R.I. 1991).
 Settlor's Capacity
Plaintiff, in support of his complaint, alleges that Decedent lacked the necessary mental capacity to execute the Trust. A settlor's capacity to create a revocable inter vivos trust is regarded as equivalent to the capacity required of a testator who is creating a trust by will. Restatement (Third) of Trusts § 11 (2003). Therefore, "[c]onversely, one who lacks testamentary capacity also lacks capacity to create a revocable inter vivos trust." Trusts § 11 cmt. b. It should be borne in mind that Defendants, as proponents of the Trust, bear the burden of proof with respect to the issue of capacity. It is "well-settled that in a will contest, the proponent of the will bears the burden of proof of testamentary capacity by a fair preponderance of the evidence." Pollard v. Hastings, 862 A.2d 770, 777 (R.I. 2004).
The standard for testamentary capacity is well-settled in Rhode Island. Our Supreme Court has held that "all that is required is that, at the time of execution of the will, the testator: `[1] has sufficient mind and memory to understand the nature of the business he is engaged in when making his will [;2] has a recollection of the property he wishes to dispose of thereby [;3] knows and recalls the natural objects of his bounty, their deserts with reference to their conduct and treatment of him, [and] their necessities [;] and [4] the manner in which he wishes to distribute his property among them.'" Pollard v. Hastings,862 A.2d at 777 (quoting Rynn v. Rynn, 55 R.I. 310, 321,181 A. 289, 294 (1935)). Notably, "[e]ccentricities, peculiarities and oddities in either speech or behavior, or fixed notions and opinions upon family or financial matters will not render a person incapable of making a will." Rynn v. Rynn,55 R.I. at 321, 181 A. at 294. In light of these requirements, this Court finds that Defendants have met the required burden and have proven by a preponderance of the evidence that the Decedent possessed the necessary mental capacity to execute the Trust.
Defendants, at trial, produced a variety of witnesses that testified to the mental capacity of Decedent. Our Supreme Court has stated that "[i]t is well settled that a lay witness may express an opinion as to a testator's mental condition when such opinion is based solely on facts within his knowledge and as to which he has previously testified." McSoley v. McSoley,91 R.I. 61, 81, 161 A.2d. 216, 226 (1960) (citing Rynn v. Rynn,55 R.I. at 323, 181 A. at 295). Decedent's doctor, Dr. David Mayer, testified that Decedent exhibited no signs of mental deficit, as recently as April 23, 2003. Dr. Mayer also testified as to his personal recollection of a visit with Decedent in September of 2002. He testified that Decedent was engaging and well-informed and appeared to have a very good higher cognitive function. Dr. Mayer's office manager testified to the same. Hazel Turley, an acquaintance of Decedent, who was assisting him in penning his memoirs, also testified. Ms. Turley testified that during their entire acquaintance, which extended to Decedent's date of death, Decedent was competent and possessed all of his faculties. This Court takes specific note of Ms. Turley's opinion as she served as an elderly specialist for the Newport County Mental Health Center and had many years experience working with elderly patients as a registered nurse. Attorney Couch also testified to Decedent's competency based upon his years of experience as a lawyer and a drafter of wills and trusts. The two witnesses to the execution of the Trust, Linda Harvey and Cheryl Lawrence, testified to the same. Both were very impressed with how articulately Decedent discussed world affairs.
Plaintiff's counsel, in support of the claim that Decedent lacked capacity to execute the Trust, relied almost exclusively on the opinion of Decedent's former attorney, Shaw, and on Plaintiff's own opinion. On October 29, 2002, Decedent contacted Shaw, his attorney of nearly twenty years, and indicated that he wanted to make changes to his estate plan. Two days later on October 31st, Decedent, accompanied by Thomas, came to Shaw's office. Shaw had Thomas remain in the waiting room while he spoke with Decedent privately in his office. Shaw testified that, at this appointment, Decedent seemed confused and was not his usual outgoing self. Shaw further testified that he was of the opinion that Decedent lacked testamentary capacity on the date of October 31, 2002. Nonetheless, Shaw testified that he was willing to draw up the requested documents, so long as Decedent came in for a second meeting, in order to clear up any confusions. On November 1, 2002, the following day, Decedent returned to Shaw's office without an appointment. Decedent informed Shaw that he had decided to execute a trust, rather than a will, and that he was going to use the services of another attorney. Based on these circumstances, considered as a whole, it does not seem very remarkable to this Court that Decedent was not acting like his usual outgoing self during the meeting with Shaw. Decedent had evidently decided to terminate their relationship of nearly two decades, a fact that could have caused Decedent to feel and act slightly uncomfortable. Further, Shaw's admission that he would have eventually drawn up the requested documents, served to undermine his opinion that Decedent lacked testamentary capacity.
To support his claim, Plaintiff also testified as to his own belief that Decedent lacked the necessary mental capacity to execute the Trust. Plaintiff attempted to show that Decedent was confused by testifying that in May of 2003, Decedent informed him that he had changed his will so that the residuary estate would now be divided equally between Plaintiff and Thomas. This, of course, is not the actual distribution accomplished by the terms of the Trust. Plaintiff further testified that at the time Decedent informed him of this change, he was not his usual outgoing self but rather was nervous and scared. This Court does not believe that Plaintiff's testimony plainly evidences a lack of testamentary capacity on the part of Decedent. The testimony, as to Decedent's demeanor, more likely, demonstrates Decedent's discomfort in telling Plaintiff that his share of the estate had been reduced. Further, this Court is not persuaded that Decedent lacked capacity merely because he inadvertently or intentionally misstated the distribution of his estate to Plaintiff. It should be noted that "virtually all of [the Rhode Island Supreme] Court's holdings relative to testamentary capacity have not required that there be `full knowledge and understanding of the will's contents.'" Bajakian v. Erinakes, 880 A.2d 843, 852
(R.I. 2005).
This Court also finds Decedent's self sufficiency and control of his personal affairs to be significant. Our Supreme Court has held that "[e]vidence that decedent was transacting business and conducting his affairs is competent and relevant to the issue of testamentary capacity." McSoley v. McSoley, 91 R.I. at 76,161 A.2d at 224. Witnesses for both sides described Decedent as self-sufficient and very involved in his personal financial affairs. Decedent, apart from the certain times where he was accompanied by Thomas, drove himself to most all of his day to day errands. Moreover, apart from certain checks written by Thomas, to be discussed more fully infra, Decedent did all of his own bill paying. He also saw to the daily maintenance of his residence, which he lived in on his own, writing out checks for snow plowing, electricity, and cable. Further, witnesses at trial testified that Decedent was very interested in current events, especially politics, and he often wrote letters to the editors of various newspapers. These facts, coupled with the above-discussed witness testimony, prove to this Court, by a preponderance of the evidence, that Decedent had the requisite mental capacity to execute the Trust.
 Undue Influence
In 2003, our Supreme Court affirmed a trial justice's finding on the issue of the application of undue influence to procure an amendment to a trust instrument. See Filippi v. Filippi,818 A.2d 608 (R.I. 2003). In affirming the trial justice's holding, that the defendant had not unduly influenced the decedent to execute the trust amendment, our Supreme Court cited to the standards it had set forth in Tinney v. Tinney and Caranci v.Howard. See Filippi v. Filippi, 818 A.2d at 630 (citingTinney v. Tinney, 770 A.2d 420, 437 (R.I. 2001); Caranci v.Howard, 708 A.2d 1321, 1324 (R.I. 1998)). The case of Caranci v. Howard, which was cited for its definition of undue influence, involved a party contesting the contents of a will. Caranci v.Howard, 708 A.2d at 1324. Tinney v. Tinney, which involved a party contesting the transfer of land by deed, also relied on the standard of undue influence set forth in Caranci v. Howard.Tinney v. Tinney, 770 A.2d at 437. As a result, this Court finds that the proper standard to apply, in determining whether undue influence exists with respect to the creation of a trust, is the same as the standard applied with respect to wills.
Undue influence is defined as the "substitution of the will of [the dominant] party for the free will and choice [of the subservient party]." Filippi v. Filippi, 818 A.2d at 630
(quoting Caranci v. Howard, 708 A.2d at 1324). The party contesting the instrument must prove undue influence by a preponderance of the evidence. Caranci v. Howard,708 A.2d at 1324; see also Murphy v. O'Neill, 454 A.2d 248, 250 (R.I. 1983). Therefore, in contrast to the issue of capacity, the burden of proof for undue influence will rest on Plaintiff, in the instant action. It is necessary to bear in mind that this Court's determination that Decedent possessed the essential mental capacity is not intrinsically connected with the current issue of undue influence. Rather "[w]eakness of mind . . . is not an essential element to a finding of undue influence, even though it may be relevant." Caranci v. Howard, 708 A.2d at 1324.
Our Supreme Court stated that "[t]he question of whether undue influence exists is a fact-intensive inquiry." Filippi v.Filippi, 818 A.2d at 630; see also Tinney v. Tinney,770 A.2d at 438. The analysis of whether there has been undue influence "requires an ad hoc, totality-of-the-circumstances approach to the facts of each particular case." Caranci v.Howard, 708 A.2d at 1326. Our Supreme Court determined that this approach allows for the consideration of events occurring both, prior to and subsequent to the execution of the challenged instrument. Id. Further, "[b]ecause the perpetrator of such covert coercion generally applies the forbidden pressure in secret, one seeking to set aside such a will is often unable to produce direct evidence of the undue influence to the fact finder but rather must rely on circumstantial evidence." Id. at 1324;see also Apollonio v. Kenyon, 101 R.I. 578, 593,225 A.2d 778, 787 (1967). Additionally, "[t]he circumstances relevant to each case and the reasonable inferences therefrom are often of more persuasive weight in the decision of the issue of undue influence than the statements of interested witnesses." Marcinkov. D'Antuono, 104 R.I. 172, 182, 243 A.2d 104, 110 (1968). Guided by these well established standards, this Court finds that Plaintiff has proven by a preponderance of the evidence that the defendant, Thomas Reopell, exerted undue influence over Decedent, resulting in Decedent's execution of the Trust.
At this point in the opinion, this Court believes that a fuller recitation of the facts surrounding the creation of the Trust is necessary. As stated above, Decedent, accompanied by Thomas, went to see attorney Shaw on the subject of making changes to his estate plan. Shaw testified that this was the only time Decedent had come to his office escorted by another individual. At trial, conflicting testimony was offered as to why Decedent was seeking to make changes to his estate plan. Shaw testified that on the October 31st visit, Decedent explained that he wanted to change his estate plan because the Defendants "desired" his estate more than Plaintiff. Shaw stated on cross-examination, "I've got it down word for word just the way [Decedent] said it. He said the Reopells desire it more, meaning his estate, and I know that's what he said."[3] Attorney Couch, on the other had, testified that Decedent had informed him that he wanted to create a trust so that he could avoid probate and a possible guardianship. Plaintiff, though, testified that Decedent, at a later date, stated that he had changed his will because Thomas had informed him that Plaintiff could no longer serve as executor because he lived partially out of state. Plaintiff also stated that Decedent had said Thomas encouraged him to do a trust instead of a will because it would be harder for someone to challenge. Thomas denies making any such statements to Decedent. Conversely, Thomas testified that Decedent had told him that he was changing his will because he was angry that Plaintiff had asked him for money to buy a condominium in Florida. Plaintiff and his wife, however, vehemently deny that any such request was ever made.
Notwithstanding the uncertainty surrounding Decedent's motivation for creating the Trust, it is undisputed that on December 11, 2002, Thomas drove Decedent to attorney Couch's office so that Decedent could make changes to his estate plan. Couch invited Decedent and Thomas into his office and allowed Thomas to remain in the room during the entirety of the meeting. At the conclusion of the December 11th meeting, Thomas wrote out an $800 retainer check for Couch and had Decedent sign it. Shortly thereafter Thomas filled out, for Decedent, the asset information sheet given to him by Couch. Though Thomas cannot recall which, he either then dropped the form off at Couch's office or mailed it. On January 8, 2003, Decedent and Thomas returned to Couch's office so that Decedent could execute the Trust and associated last will. These estate planning documents were explained to Decedent, in the presence of Thomas, by Couch's paralegal Linda Harvey. Linda Harvey and a paralegal from another office in the building, Cheryl Lawrence, witnessed Decedent's execution of the Trust and last will. At the end of the meeting, Thomas wrote another check to Couch in the amount of $800. Upon leaving the meeting Thomas took the bag of Decedent's estate planning documents to his house, where they were thereafter kept.
It is important, at this juncture, to note that in addition to Decedent's home and personal property Thomas was also slated to receive a significant amount of cash upon the death of Decedent. Thomas and his wife, Elaine, were designated as pay-on-death beneficiaries on five certificate of deposit accounts held at Providian Bank in New Hampshire. One of these five Providian accounts matured on November 10, 2003, during the lifetime of Decedent, and was deposited by the Decedent into the Trust. The remaining four accounts, totaling approximately $83,000, were still active upon Decedent's death and were designated to be paid to Thomas. Thomas testified that Decedent wanted him to have this money so that he could use it to take care of the home that Decedent was leaving to him. However, incongruously, Thomas lost his right to these funds when, after Decedent's death, Thomas re-titled the Providian accounts to the Trust, and as a result the accounts lost their pay-on-death designation. Thomas testified that this was a "dumb mistake" on his part. It is also worth mentioning that Thomas participated in his beneficiary designation by contacting Providian Bank and asking to be designated as a beneficiary on the appropriate forms, and then requesting the forms be sent to Decedent. Thomas later, by hand, added his wife, Elaine, as an additional beneficiary. Thomas soon after mailed the forms back to Providian Bank, once they had been executed by Decedent.
At trial, it was made clear to this Court that, in addition to his involvement with the Providian accounts, Thomas aided the Decedent in nearly every aspect of the creation and funding of the Trust. This was in spite of the fact that Decedent was clearly capable of conducting his own business affairs and of writing out his own checks. The latter fact was demonstrated, to the satisfaction of this Court, with the production of copies of over two-hundred checks written entirely by Decedent during the period of October 17, 2002 to January 14, 2004. During this same time period, however, Thomas would also write out checks for Decedent and then have Decedent sign them. It is striking that all of the checks written by Thomas, with the exception of one, related to the transfer of assets into the Trust or were to pay obligations on Decedent's residence, which Thomas was to inherit. Thomas testified that he wrote the checks at the request of Decedent but could offer little explanation as to why Decedent only asked him to write out those certain checks. Thomas speculated that he was likely in the room with Decedent when those checks were in need of being written, and therefore, Decedent may have found it easier to ask him to fill them out. This explanation at trial was conspicuously inconsistent with Thomas' initial deposition. Thomas originally claimed that the only check he ever wrote out for Decedent was to pay for medication, the day before Decedent died. However, after Plaintiff's counsel obtained the check images from Sovereign Bank and consulted with a handwriting expert, Thomas admitted that he had written out many more checks for Decedent.
Plaintiff offered additional evidence, which demonstrated Thomas' significant involvement in the creation and funding of the Trust. Donna Perry, branch manager at Coastway Credit Union, testified that during the three years that Decedent banked with Coastway, he would come in about once a month, always alone. Only on the day that the Trust was funded was Decedent accompanied by another individual, Thomas. Further, evidence was introduced that demonstrated that Thomas, not Decedent, was the party primarily in contact with Couch's office. Thomas testified that he may have been the one to call and set up the initial appointment and that he would likely have called for Decedent if any problems with the Trust had arisen. In addition, it was Thomas and not Decedent, who later called when there was some confusion about a filing fee that had to be paid so that William's mortgage could be assigned. This fact was plainly evidenced by a letter issued from Couch's office however; Thomas testified that he was unable to remember placing such a call.
In fact, it became apparent throughout Thomas' testimony that he had difficulty recalling certain facts and occurrences. Thomas' inability to call to mind certain instances was demonstrated repeatedly with a few examples being the amount of times he visited Shaw's office, where he was when he filled out Couch's asset identification form and whether he had mailed such form or hand delivered it. What Thomas did recall, on the stand, was for the most part self-serving. While Thomas had difficulty recalling much of the meeting with Couch, he was able to very clearly recollect one point. Thomas testified that he recalled, during the meeting, interjecting his concern that Decedent have access to a sufficient amount of funds so that he would not have to go into a nursing home. Thomas also very clearly remembered, and was able to describe nearly verbatim, the aforementioned alleged conversation, in which Decedent expressed his disfavor with Plaintiff for supposedly asking for money to buy a condominium. This Court further found it revealing that following the death of Decedent, Thomas, who had become trustee upon Decedent's death, refused to furnish Plaintiff with a copy of the Trust. Plaintiff, a named beneficiary under the Trust, repeatedly requested that Thomas provide him with a copy. However Thomas refused and only did so after this action had been commenced and Plaintiff had filed a motion requesting this Court order production of the Trust.
Considering the above circumstances in their totality, this Court finds that Plaintiff has proven to this Court's satisfaction, by a preponderance of the evidence, that Thomas Reopell wielded undue influence over Decedent. The result of Thomas' influence was an estate plan that, had Thomas not made the mistake of retitling the Providian accounts, would have resulted in himself, his brother, and his nephew all receiving approximately $100,000. This Court is persuaded, in part, by the details of Thomas' intimate involvement in the creation and administration of the challenged Trust. Moreover, this close involvement is even more suspect in light of Decedent's clear ability to conduct his own personal affairs. Further unsettling was Thomas' accompaniment of Decedent to his lawyer's office and banks, in light of testimony that clearly indicated that Decedent typically handled such tasks alone. This Court experienced similar disquiet in the fact that all of the checks written out by Thomas for the Decedent pertained only, with the exception of one, to the Trust or obligations on the home that Thomas was to inherit. This Court also found the inconsistencies between Thomas' deposition and his trial testimony, as well as Thomas' tendency to recall only self-serving particulars, to be probative. Although this list of evidence is not exhaustive, this Court makes a final note of Thomas' evasive behavior, following the death of Decedent, in refusing to furnish Plaintiff with a copy of the Trust. For all these reasons, this Court finds that Thomas Reopell did exert undue influence by substituting his will and desires for the free will of the Decedent.
 Conclusion
Upon review of the evidence presented, this Court finds that Decedent Ernest Romano did possess the required mental capacity to execute the Ernest J. Romano Revocable Living Trust. However, this Court holds that the Trust was procured through the exertion of undue influence, solely on the part of defendant, Thomas Reopell. Pursuant to its discretionary authority to issue such equitable remedy, this Court grants Plaintiff's request to declare null and void the Ernest J. Romano Revocable Living Trust. The effect of this declaration renders the last will, which accompanied the Trust, also null and void of purpose. Counsel shall submit an appropriate order for entry in accordance with this Court's decision.
[1] A claim calling for the cancellation of a trust is equitable in nature, and thus, there is no constitutional right to a trial by jury. See Filippi v. Filippi, 818 A.2d 608, 629
(R.I. 2003).
[2] "The superior court shall, except as otherwise provided by law, have exclusive original jurisdiction of suits and proceedings of an equitable character." Sec. 8-2-13.
[3] See Transcript of Record at 67, Romano v. Reopell, KC 2004-0705.